NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11833

COMMONWEALTH  vs.  JASON ESTABROOK
(and nine companion cases[1]).

Middlesex.    May 7, 2015. - September 28, 2015.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk,
& Hines, JJ.


Cellular Telephone.  Constitutional Law, Search and seizure,
     Probable cause.  Search and Seizure, Expectation of
     privacy, Probable cause, Warrant, Affidavit, Fruits of
     illegal search.  Probable Cause.  Evidence, Result of
     illegal search.  Practice, Criminal, Warrant, Affidavit.



     Indictments found and returned in the Superior Court
Department on December 6, 2012.

     Pretrial motions to suppress evidence were heard by Kathe
M. Tuttman, J.

     Applications for leave to file interlocutory appeals were
allowed by Lenk, J., in the Supreme Judicial Court for the
county of Suffolk, and the appeals were reported by her.


     George E. Murphy, Jr., for Jason Estabrook.
     Daniel Beck (Susan M. Costa with him) for Adam Bradley.

_____

     [1] Four against Jason Estabrook and five against Adam
Bradley.

Jamie Michael Charles, Assistant District Attorney (David Marc Solet, Assistant District Attorney, with him) for the Commonwealth.

Andrew Sellars, for American Civil Liberties Union of Massachusetts & another, amici curiae, submitted a brief.

BOTSFORD, J.  In this case, we consider again a search of historical cellular site location information (CSLI).[2]  See Commonwealth v. Augustine, 467 Mass. 230 (2014), S.C., 470 Mass. 837 (2015).  The defendants, Jason Estabrook and Adam Bradley, stand indicted for murder and related crimes arising out of a shooting that took place on July 7, 2012, in Billerica.  They moved to suppress evidence of historical CSLI pertaining to Bradley's cellular telephone that the police initially obtained in July, 2012, without a search warrant but in compliance with 18 U.S.C. §  2703 (2006), and then, in November, 2013, reobtained pursuant to a warrant.  The defendants also sought

---

[2] Cellular site location information (CSLI) "refers to a cellular telephone service record or records that contain information identifying the base station towers and sectors that receive transmissions from a [cellular] telephone" (quotations and citation omitted).  Commonwealth v. Augustine, 467 Mass. 230, 231 n.1 (2014), S.C., 470 Mass. 837 (2015).  It is a record of a subscriber's cellular telephone's communication with a cellular service provider's base stations (i.e., cell sites or cell towers) during calls made or received, id. at 237-238; this identifies the approximate location of the "active cellular telephone handset within [the cellular service provider's] network based on the handset's communication with a particular cell site."  See id. at 238.  Historical CSLI is "CSLI relating to and generated by cellular telephone use that has already occurred at the time of the order authorizing the disclosure of such data" (quotations and citation omitted).  Id. at 231 n.1.

suppression of statements they each made to police in 2012, following the receipt of Bradley's CSLI. A judge of the Superior Court denied the motions after an evidentiary hearing; the defendants filed these interlocutory appeals. See Mass. R. Crim. P. 15 (a) (2), as appearing in 422 Mass. 1501 (1996).

Returning to an issue briefly touched on in Augustine, 467 Mass. at 255 n.37, we conclude that a defendant's reasonable expectation of privacy protected under art. 14 of the Massachusetts Declaration of Rights is not violated where the Commonwealth requests up to six hours of historical CSLI without obtaining a search warrant. In this case, however, because the Commonwealth requested two weeks of historical CSLI, a search warrant was required, even though the Commonwealth proposes to use only six hours of the CSLI as evidence at trial. Nevertheless, we decide that many of the defendants' statements and Bradley's CSLI are not subject to suppression on account of the CSLI that was first obtained unlawfully: the defendant's statements were not made in response to being confronted by that tainted CSLI, and the 2013 search warrant was supported by probable cause derived from information the Commonwealth obtained independently rather than through exploitation of the tainted CSLI.

Background. To provide context, we summarize some of the background facts as found by the motion judge, reserving

additional facts for consideration in connection with the issues raised in these appeals.[3] At approximately 3:50 A.M. on July 7, 2012, Quintin Koehler (victim) and his brother, Ryan, were at their home in Billerica when they heard loud noises coming from the kitchen. According to Ryan, the two brothers went into the kitchen where they were confronted by three to four masked men. Each of the intruders appeared to be in his early twenties, and at least two of them were holding firearms. One of the intruders, whom we shall call the "first intruder," had a gun and ordered the two brothers onto the ground. The victim refused and hit a different intruder, whom we shall call the "second intruder," with a tea kettle, after which a struggle ensued between them. At that point one or two of the other intruders shot the victim in the head and shoulder. All the intruders then fled the scene on foot. A few minutes later, police and emergency personnel arrived, and at 3:58 A.M. the victim was transported to a hospital where he died of a gunshot wound to the head. On July 10, 2012, Nicholas Cappello told Deputy Chief Roy Frost of the Billerica police department and State police Trooper Anthony DeLucia that he lived with the victim, that he regularly purchased and distributed marijuana, and that at times he purchased the drugs from a supplier in Lynn

---

[3] The defendants do not appear to dispute the facts stated here.

named Ashley. The police learned that the supplier was Ashley Marshall, and that the defendant Bradley was an associate of hers.

Prior to July 25, 2012, an assistant district attorney obtained through administrative subpoenas, see G. L. c. 271, § 17B, certain telephone records (call logs) of Bradley and Marshall. The call logs associated with Bradley's cellular telephone revealed the time and duration of incoming and outgoing calls. They also showed the telephone numbers associated with each call; they did not contain CSLI. These call logs revealed, among other things, that Bradley's telephone was in contact with Marshall's telephone often on the night of the shooting.

On July 25, 2012, based on information gleaned from the call logs and the police investigation, the Commonwealth filed an application in the Superior Court seeking an order to obtain from Bradley's cellular service provider certain records, including historical CSLI, relating to his cellular telephone for the period from July 1 through July 15, 2012. Pursuant to 18 U.S.C. § 2703(d), a Superior Court judge issued the requested order (§ 2703[d] order).[4] Bradley's CSLI evidence indicated that

_____

[4] Section 2703(d) of the Federal Stored Communications Act, 18 U.S.C. § 2701 et seq. (2006), allows a court of competent jurisdiction to issue an order requiring a cellular telephone company to disclose certain types of records of customers,

at the time the shooting took place, his cellular telephone was in the area of Burlington and Bedford and communicating with a cell tower located three miles from the victim's home.[5]

On August 2, 2012, police officers interviewed Bradley, who was not in custody and who denied involvement in the July 7 shooting, but in response to their questions, told the officers of his cousin, the defendant Estabrook.  Police then interviewed Estabrook on August 15, during which Estabrook volunteered that he had sought treatment for a dislocated shoulder at Salem Hospital in the early morning hours of July 7, shortly after the shooting had occurred.  After the police conducted further investigation, on September 26, 2012, Estabrook was arrested for the murder of the victim.  On September 27, in another interview with the investigating officers, Estabrook detailed the facts of

_____

including CSLI, to a governmental entity if the government establishes that "specific and articulable facts" show "reasonable grounds to believe" that the records "are relevant and material to an ongoing criminal investigation."

[5] In addition to the Superior Court order pursuant to 18 U.S.C. § 2703(d) (§ 2703[d] order) pertaining to Bradley's CSLI, the Commonwealth obtained § 2703(d) orders requiring the disclosure of CSLI associated with the cellular telephone numbers of certain persons who are not parties to these appeals, covering the period from July 1 to July 15, 2012.  The police had learned from previously obtained telephone records (call logs) that the cellular telephones of some of the other individuals were in contact with Bradley's cellular telephone close to the time of the shooting.  The CSLI obtained in relation to some of these individuals revealed that their cellular telephones also were in the area of the victim's home around the time of the shooting.

the July 7 home invasion and shooting and implicated himself, Bradley, and others in the crimes. That same day, the officers also spoke to Bradley, who again denied any personal involvement, saying that he knew of how the incident transpired only from what Estabrook had told him.

On December 6, 2012, a Middlesex County grand jury returned indictments against Bradley and Estabrook, charging each with murder in the first degree, armed home invasion, attempted armed robbery, carrying a firearm without a license, and unlawful possession of ammunition. On November 20, 2013, Billerica police applied for and obtained search warrants for the same CSLI that the Commonwealth had collected pursuant to the § 2703(d) orders obtained in 2012, including Bradley's CSLI covering the period from July 1 to July 15, 2012.[6]

In June, 2014, Bradley and Estabrook filed separate motions to suppress evidence of Bradley's historical CSLI on the ground that the Commonwealth had obtained this evidence in violation of art. 14.[7] See Augustine, 467 Mass. at 232. Both motions also

---

[6] Deputy Chief Roy Frost of the Billerica police department submitted an affidavit in which he recited facts supporting the search warrant applications and indicated that the police sought the warrants in light of uncertainty as to whether Massachusetts law required probable cause and a search warrant, rather than a § 2703(d) order alone, to obtain the CSLI at issue in this case.

[7] Jason Estabrook did not have a cellular telephone at the time of this investigation. Estabrook contended in his motion to suppress that he had standing to argue for suppression of

sought suppression of the defendants' statements made to police allegedly derived from the CSLI:  Estabrook argued in favor of suppression of his August 15 and September 27 statements; Bradley sought suppression of the statements he made on August 2 and September 27.[8]  After an evidentiary hearing, the motion judge denied the defendants' motions.  The judge determined that the July 25, 2012, § 2703(d) order for Bradley's CSLI was not supported by probable cause.  She further concluded, however, that probable cause and a search warrant were not required for the CSLI pertaining to the six-hour period surrounding the time of the July 7 shooting because the defendants had no reasonable expectation of privacy in CSLI covering so brief a period.  As to the CSLI covering the periods beyond this six-hour window, the judge ruled that suppression was not called for in light of the fact that the police had obtained a search warrant for this CSLI, which was supported by probable cause derived from evidence independent of the CSLI.  A single justice allowed the defendants' applications for interlocutory review and directed that their appeals be consolidated and heard in this court.

_____

Bradley's CSLI because Estabrook used Bradley's telephone at times.  The motion judge assumed for argument that Estabrook did have standing to challenge the use of Bradley's CSLI.

[8] Estabrook also appears to have sought suppression of substantially all of Bradley's statements made to police during the investigation.

Discussion. 1. Standard of review. "When reviewing the denial of a motion to suppress, we accept the judge's findings of fact and will not disturb them absent clear error." Commonwealth v. Watson, 455 Mass. 246, 250 (2009). However, we undertake "an independent determination as to the correctness of the judge's application of constitutional principles to the facts as found." Id.

2. Warrant requirement. The defendants challenge the motion judge's ruling that the Commonwealth did not need a search warrant to obtain the CSLI covering the six-hour window surrounding the July 7 shooting.[9] They contend that any suggestion in this court's decision in Augustine that a request for CSLI for a period of six hours or less would not require a warrant is irrelevant to this case because here the Commonwealth requested CSLI covering a period of two weeks, thereby subjecting the request to the warrant requirement of art. 14. We agree.

---

[9] Like the motion judge, we assume without deciding that Estabrook has standing to challenge the Commonwealth's collection of CSLI associated with cellular telephones that he was using around the time of the shooting, such as Bradley's. However, to the extent Bradley and Estabrook appear to claim that they have a right to seek suppression of the CSLI of other defendants, their claim is likely waived for lack of proper argument, see Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975), but in any event, we agree with the motion judge that they do not have standing because there is no evidence that either was using the cellular telephones of other persons who are not parties to these appeals.

In Augustine, the court held that a person has a reasonable expectation of privacy in historical CSLI relating to his or her cellular telephone, at least insofar as it covers a two-week period, and that this expectation of privacy rendered the Commonwealth's access to this information a search in the constitutional sense, subject to the warrant requirement of art. 14.[10]  Augustine, 467 Mass. at 232, 255.  However, we surmised that there may be "some period of time for which the Commonwealth may obtain a person's historical CSLI by meeting the standard for a § 2703(d) order alone, because the duration is too brief to implicate the person's reasonable privacy interest."  Id. at 254.  Although we declined in Augustine to announce "a temporal line of demarcation between when the police may not be required to seek a search warrant for historical CSLI and when they must do so," we assumed without deciding that "a request for historical CSLI . . . for a period of six hours or less would not require the police to obtain a search warrant in addition to a § 2703(d) order" (emphasis added).  Id. at 255 n.37.  We now hold that, assuming compliance with the requirements of 18 U.S.C. § 2703, the Commonwealth may obtain historical CSLI for a period of six hours or less relating to an

---

[10] In so holding, the court noted that probable cause is a higher standard than that applicable to a § 2703(d) order. Augustine, 467 Mass. at 236.

identified person's cellular telephone from the cellular service provider without obtaining a search warrant, because such a request does not violate the person's constitutionally protected expectation of privacy.[11,12]

It is important to emphasize that, in terms of reasonable expectation of privacy, the salient consideration is the length of time for which a person's CSLI is requested, not the time covered by the person's CSLI that the Commonwealth ultimately seeks to use as evidence at trial. See Augustine, 467 Mass. at 254. It would violate the constitutional principles underlying

---

[11] "[P]olice, trial judges, prosecutors, and defense counsel are entitled to as clear a rule as possible" regarding the amount of historical CSLI that may be requested without a warrant. See Commonwealth v. Rosario, 422 Mass. 48, 53 (1996). Accordingly, there is value in adopting a bright-line rule that a request for historical CSLI for a period covering six hours or less does not require a search warrant in addition to a § 2703(d) order. See id. at 56 (adopting bright-line rule that "otherwise admissible statement is not to be excluded on the ground of unreasonable delay in arraignment, if the statement is made within six hours of the arrest" in light of differing views of trial court judges as to reasonableness of delays in arraigning individual defendants). See also Commonwealth v. Powell, 468 Mass. 272, 279-282 (2014).

[12] This exception to the warrant requirement for CSLI applies only to "telephone call" CSLI, which is at issue in this case, and not to "registration" CSLI. "Telephone call" CSLI indicates the "approximate physical location . . . of a cellular telephone only when a telephone call is made or received by that telephone." Augustine, 467 Mass. at 258-259 (Gants, J., dissenting). By contrast, "registration" CSLI "provides the approximate physical location of a cellular telephone every seven seconds unless the telephone is 'powered off,' regardless of whether any telephone call is made to or from the telephone." Id. at 259 (Gants, J., dissenting).

our decision in Augustine to permit the Commonwealth to request and obtain without a warrant two weeks of CSLI -- or longer -- so long as the Commonwealth seeks to use evidence relating only to six hours of that CSLI. Cf. United States v. Verdugo-Urquidez, 494 U.S. 259, 264 (1990), quoting United States v. Calandra, 414 U.S. 338, 354 (1974) (Fourth Amendment to the United States Constitution "prohibits 'unreasonable searches and seizures' whether or not the evidence is sought to be used in a criminal trial, and a violation of the Amendment is 'fully accomplished' at the time of an unreasonable governmental intrusion"); United States v. Leon, 468 U.S. 897, 906 (1984) (wrong under Fourth Amendment is "unlawful search or seizure itself" [citation omitted]). Because the Commonwealth requested, and obtained, CSLI relating to Bradley's cellular telephone covering an entire two-week period of which the six hours at issue were just a small part, as in Augustine, see 467 Mass at 232-233, the warrant requirement applied to the entirety of Bradley's CSLI that was requested.

This conclusion, however, does not resolve the defendants' appeals. The statements made by Bradley and Estabrook after the police obtained Bradley's CSLI still are admissible if they are not the fruits of the illegal search of the CSLI. Similarly, Bradley's CSLI is admissible if the search warrant ultimately obtained for this CSLI was based on evidence that provided

probable cause and derived from a source independent of the tainted CSLI.  We address these two issues in turn.

3.  _The defendants' statements_.  The defendants assert that their statements to the police must be suppressed as a result of the initial illegal search of Bradley's CSLI.[13]  Their claim is a general one:  because the police obtained Bradley's CSLI before any of the several interviews of Estabrook and Bradley, everything the defendants stated during those interviews must be suppressed as tainted fruits of the unlawfully obtained CSLI. We disagree; the inquiry is more individualized.  The "crucial question" regarding whether a particular statement must be suppressed as the fruit of the initial illegal search of Bradley's CSLI is whether that statement "has been come at by exploitation of . . . [the illegal search] or instead by means sufficiently distinguishable to be purged of the primary taint." See _Commonwealth_ v. _Bradshaw_, 385 Mass. 244, 258 (1982), quoting _Wong Sun_ v. _United States_, 371 U.S. 471, 488 (1963).  With this in mind, we examine the statements at issue.

a.  _Bradley's interview on August 2_.  The motion judge implicitly found that the police were investigating Bradley's

_____

[13] Although the point is far from clear in their briefs, we will assume that both defendants argue for suppression of _all_ of their various statements to the police.

involvement in the shooting prior to obtaining his CSLI,[14] as demonstrated by her finding that the Commonwealth sought and obtained through an administrative subpoena Bradley's call logs before seeking and securing the § 2703(d) order for Bradley's CSLI.[15]  When Frost and DeLucia interviewed Bradley on August 2, before the officers confronted Bradley with any information derived from the tainted CSLI, he identified Estabrook as someone who occasionally used his cellular telephone.[16]

---

[14] As stated in Frost's affidavit, the Commonwealth secured § 2703(d) orders for CSLI, including that associated with Bradley's cellular telephone, on July 25, 2012, and obtained Bradley's CSLI on July 31, 2012, pursuant to those orders.

[15] It is true that Frost also said at the motion to suppress hearing that Bradley's CSLI was the "strongest" piece of information suggesting his involvement in the shooting at the time Bradley spoke to police on August 2, 2012.  Nevertheless, the thrust of Frost's testimony is that the police focused on Bradley as a suspect soon after the shooting and were interested in interviewing him prior to obtaining his CSLI.

[16] State police Trooper Anthony DeLucia asked Bradley whether anyone else had used his telephone in the past.  We do not view this question as exploiting Bradley's CSLI because he already had confronted Bradley with his call logs that revealed multiple calls having been placed from Bradley's telephone to Ashley Marshall's telephone on the night of the shooting.  The basis for DeLucia's questions, therefore, had a source, the call logs, that was independent of and indeed existed prior to the CSLI.

Furthermore, to the extent that the motion judge concluded that Bradley led investigators to Estabrook only after being confronted with the illegally obtained CSLI, we disagree. Although Bradley only described Estabrook's allegedly violent tendencies after being confronted with the CSLI, see note 17, infra, Bradley volunteered Estabrook's name as his cousin who used his cellular telephone before the CSLI came into play in

Accordingly, Bradley's statement did not result from the police exploiting Bradley's CSLI and was not a fruit of the illegal search of that CSLI.  See Bradshaw, 385 Mass. at 258. Suppression of this statement is not required.[17]

b.  Estabrook's interviews on August 8 and August 15.  Soon after Bradley's August 2 interview, the police began investigating Estabrook's involvement in the shooting and

---

Bradley's August 2 interview.  Given that Bradley told police that Estabrook occasionally used his telephone and that the police knew from the call logs that Bradley's telephone made and received numerous calls immediately around the time of the shooting, it is reasonable to assume that the police would have investigated Estabrook even absent the information from Bradley describing Estabrook's alleged propensity for violence.  Frost indicated as much in his testimony at the evidentiary hearing on the motion to suppress.

[17] In Bradley's August 2 interview, DeLucia and Frost "exploited" his CSLI for the first time by asking Bradley, "[I]s there any reason why [your] phone would not be in Lynn [on the night of the shooting] and somebody would be on it outside of Lynn?"  In response, Bradley again mentioned Estabrook, described Estabrook as a person who is "crazy" and "likes to rob people," and later added that Estabrook is "capable" of committing murder.  Independent of whether these statements were the fruit of the illegal CSLI, Bradley's statements of opinion about Estabrook's supposed character and propensities would be inadmissible at trial on the ground that Bradley's opinion on such issues is irrelevant.

Bradley also mentioned, at some point after being confronted with his CSLI, that Estabrook had a cut on his head in July, 2012.  Bradley was unable to say with any certainty, however, whether Estabrook had the cut around the time of the shooting.  We leave for the motion judge on remand to determine whether Bradley's statement regarding Estabrook's cut was sufficiently connected to any confrontation with CSLI to warrant suppression.

learned that his large physical build was consistent with the description of the second intruder, and that he, like Bradley, had a history of convictions for offenses involving violence and firearms. The police first interviewed Estabrook on August 8.

In the August 8 interview, Frost told Estabrook, "[W]e had this incident . . . on that Saturday, early morning hours, and, you know, we have some information that puts you there." Almost immediately thereafter, however, State police Trooper Kevin Baker said to Estabrook, "[W]e know that there was a group of people there. We have some good information on the reason they were there and what was going on and how things went down and what those people look like and . . . what their appearance was and where they and how they fled," and that Estabrook's name "continually keeps coming up." Here, an argument could be made that the police officers were exploiting Bradley's illegally obtained CSLI because Frost had been told by Bradley that Estabrook occasionally used Bradley's telephone and Bradley's CSLI placed the telephone close to the scene of the shooting at the time it occurred. We conclude that it is more probable that the police officers' statements reflect the results of the continuing investigation into the shooting that they were conducting independent of Bradley's CSLI. At this time the police did not have any information about whether Bradley or Estabrook had Bradley's telephone at the time of the shooting.

Furthermore, Bradley had given Estabrook's name to investigators prior to being confronted with the tainted CSLI, and the police then determined, necessarily independent of any CSLI, that Estabrook matched the physical appearance of the second intruder who had been described by the victim's brother shortly after the shooting.  See Commonwealth v. Watkins, 375 Mass. 472, 483 n.9 (1978) (defendant's statements were not fruit of earlier illegality where "statements came to light by means independent from" illegality).

As for Estabrook's August 15 statements, it appears that this interview of Estabrook was not recorded, and the undisputed testimony of Frost was that the police did not confront Estabrook with any information related to the CSLI. Accordingly, suppression of evidence of Estabrook's statements made on August 8 and August 15 is not called for.  See Commonwealth v. Shipps, 399 Mass. 820, 829 (1987) ("improper conduct unrelated to the statements does not compel suppression of the statements").

c.  Estabrook's interview on September 27.  Unrelated to any exploitation of Bradley's CSLI, the police discovered from Estabrook during his August 15 interview that he had sought treatment at Salem Hospital on the night of the shooting. Police obtained copies of Estabrook's medical records and gleaned from the hospital surveillance videos that he had

arrived at the hospital shortly after the shooting wearing clothes substantially matching those of the second intruder, and told medical staff that he was "hit in the head with a tea kettle." Because Estabrook's statement was consistent with the victim's brother's account of what happened to the second intruder at the scene of the shooting, the police arrested Estabrook, and advised him of the Miranda rights. He agreed to speak with the police. During that interview, Estabrook implicated himself, Bradley, and others in the shooting. These statements also are not required to be suppressed.[18] See Commonwealth v. Nickerson, 79 Mass. App. Ct. 642, 649 (2011) (police misconduct "cannot deprive the [Commonwealth] of the opportunity to prove [the defendant's] guilt through the introduction of evidence wholly untainted by the police misconduct" [citation omitted]).

---

[18] The record indicates that Estabrook made incriminating statements in the interview after Frost twice told him that he knew Estabrook was in the house when the shooting occurred. However, what Frost told Estabrook was not, in our view, an exploitation of Bradley's tainted CSLI. It is more likely that Frost's statement that Estabrook was at the scene of the shooting was derived from Estabrook's appearance at the hospital right after the shooting, in attire substantially matching that of the second intruder, and from Estabrook's statement to his treatment providers that he had been hit with a tea kettle. All that Bradley's CSLI did, after all, was locate his cellular telephone and its user -- whether Bradley or Estabrook -- within three miles of the victim's home in Billerica; the CSLI did not place the telephone in the house itself.

d.  Bradley's interview on September 27.  Frost and DeLucia interviewed Bradley again on September 27, 2012, following their postarrest interview of Estabrook.[19]  As he had on August 2, Bradley denied involvement in the shooting, and stated repeatedly that Estabrook had informed him of the shooting incident.  Specifically, Bradley said that Estabrook told him that he, Estabrook, had been hit in the head with a pot; that another individual, Gabriel Arias, shot the victim; and that a third individual, Peter Bin, also was present in the house for the shooting.  Bradley said that, according to Estabrook, Bin carried a .45 caliber pistol and Arias had a nine millimeter handgun during the home invasion.

Suppression of these statements is not required. Throughout this interview, Frost and DeLucia confronted Bradley with information they had just learned from Estabrook, independently of the CSLI.[20]  To the extent the police told Bradley during the interview that they knew he was involved in the shooting, their questions and statements made clear that they had obtained this information through Estabrook's untainted

---

[19] At the time of this interview, Bradley was also under arrest, but in connection with an unrelated matter.

[20] During the interview the investigators asked Bradley who had his telephone on the night of the shooting and told him that his "phone was in Billerica."  As discussed infra, Bradley's responses to these questions are inadmissible.

confession and other independent sources, rather than by exploiting the CSLI.[21]

Although the defendants challenge the admissibility of all their statements as tainted by the previously obtained CSLI for Bradley's cellular telephone. We have rejected that approach. Rather, we have focused primarily on the statements that were included in the affidavit and that support probable cause independent of the earlier, unlawfully obtained CSLI. The motion judge relied on Brown v. Illinois, 422 U.S. 590, 603-604 (1975), to conclude that none of the statements of Estabrook or Bradley needed to be suppressed because they were sufficiently attenuated from the illegal search of Bradley's CSLI. We agree with the judge insofar as her decision applies to Estabrook's statements, because we are persuaded that none of his statements was the product of the police confronting him with evidence of

---

[21] Furthermore, we are not persuaded by Bradley's contention that his September 27 statements must be suppressed under the "cat-out-of-the-bag" rule. See Commonwealth v. Mahnke, 368 Mass. 662, 686 (1975), cert. denied, 425 U.S. 959 (1976) ("The cat-out-of-the-bag line of analysis requires the exclusion of a statement if, in giving the statement, the defendant was motivated by the belief that, after a prior coerced statement, his effort to withhold further information would be futile and he had nothing to lose by repetition or amplification of the earlier statements"). We have concluded that the bulk of Bradley's statements in his first interview on August 2 are admissible. In any event, Bradley's statements in the August 2 interview did not include any sort of admission of guilt or indication that Bradley knew about the details of the shooting. In the circumstances, there was no reason for Bradley to think, based on his statements of August 2 that it would be "futile" to withhold details of the shooting on September 27.

Bradley's CSLI.  Certain of Bradley's statements are another matter.  At times during their interviews of Bradley, and particularly in the August 2 interview, the police officers asked questions based directly on the tainted CSLI.  The Commonwealth argues that all of Bradley's statements, including the responses to direct CSLI challenges, are admissible because, like Estabrook's, they were attenuated from the initial illegal search of the CSLI.  We disagree.  Even though the Commonwealth requested Bradley's CSLI on July 25 and obtained it on July 31, Bradley was not confronted with any question based on his CSLI until he was interviewed on August 2 and September 27.[22]  Thus, the circumstances here are materially different from cases, relied upon by the Commonwealth, in which a defendant's statements made hours after he was illegally arrested or after his home was illegally searched -- and, thus, made hours after he became aware of the arrest or the search -- were too attenuated from the arrest to be suppressed.  See Commonwealth v. Sylvia, 380 Mass. 180, 183-185 (1980), citing Commonwealth v. Fielding, 371 Mass. 97, 113-114 (1976).  Insofar as Bradley is concerned, his statements in direct response to confrontation with evidence of his CSLI were made in close proximity to the

---

[22] The Commonwealth's access to Bradley's CSLI prior to these interviews had been without his knowledge:  the § 2703(d) order pertaining to Bradley's CSLI explicitly prohibited disclosing it to him.

illegality, and there were no intervening circumstances between the police questions based on the CSLI and Bradley's responses thereto. See Commonwealth v. Damiano, 444 Mass. 444, 456 (2005). The statements must be suppressed. See Commonwealth v. Keefner, 461 Mass. 507, 518 (2012) (direct product of unlawful search must be suppressed); Commonwealth v. Porter P., 456 Mass. 254, 275 (2010) (suppression required of juvenile's statement about gun, made immediately after search of juvenile's room, and juvenile's removal from room; statement was not so distant in time from illegal search to dissipate taint). We now turn to the CSLI itself, which was the subject of the 2013 search warrant.

4. Search warrant for CSLI. Even though the exclusionary rule generally bars from admission evidence "obtained during an illegal search as fruit of the poisonous tree, evidence initially discovered as a consequence of an unlawful search may be admissible if later acquired independently by lawful means untainted by the initial illegality" (quotation omitted). Commonwealth v. DeJesus, 439 Mass. 616, 624 (2003). Accord Commonwealth v. Frodyma, 393 Mass. 438, 441 (1984); Commonwealth v. Benoit, 382 Mass. 210, 216-217 (1981), S.C., 389 Mass. 411 (1983). See Nix v. Williams, 467 U.S. 431, 443 (1984); United States v. Silvestri, 787 F.2d 736, 740 (1st Cir. 1986), cert. denied, 487 U.S. 1233 (1988). Accordingly, the appropriate

inquiry here is whether, given the "primary illegality" of the Commonwealth's access to Bradley's CSLI pursuant to a § 2703(d) order, the 2013 search warrant for the same CSLI was secured "by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." See Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392 (1920); Frodyma, supra, quoting Wong Sun, 371 U.S. at 488; Commonwealth v. Forbes, 85 Mass. App. Ct. 168, 176 (2014). See generally J.A. Grasso, Jr., & C.M. McEvoy, Suppression Matters Under Massachusetts Law § 20-3[a], at 20-10 (2014). The Commonwealth bears the burden of showing by a preponderance of the evidence the absence of taint, i.e., that the Commonwealth obtained information supplying the requisite probable cause through an independent source.[23] See Commonwealth v. Fredette, 396 Mass. 455, 459 (1985).

---

[23] The defendants urge this court to require the Commonwealth to establish an independent source by clear and convincing evidence. They note that the clear and convincing evidence standard governs circumstances in which the Commonwealth seeks to establish that a witness's in-court identification is derived from a source independent of a prior suppressed identification. See Commonwealth v. Bell, 356 Mass. 724, 724-725 (1969). The independent source rule applied in this case, however, is more akin to the inevitable discovery rule, to which we have applied the preponderance of the evidence standard. See Commonwealth v. O'Connor, 406 Mass. 112, 117 (1989) ("the Commonwealth has the burden of proving the facts bearing on inevitability by a preponderance of the evidence"). See also Nix v. Williams, 467 U.S. 431, 444 (1984) (rationale of independent source rule is "wholly consistent" with inevitable discovery rule); Commonwealth v. Benoit, 382 Mass. 210, 217

It is well settled that the court looks to the "four corners of the affidavit" to determine whether a search warrant application establishes probable cause.  See, e.g., Commonwealth v. O'Day, 440 Mass. 296, 297 (2003), quoting Commonwealth v. Villella, 39 Mass. App. Ct. 426, 428 (1995).  The defendants concede that on its face Frost's affidavit filed in support of the warrant established probable cause to search Bradley's CSLI.  They argue, however, that, contrary to the determination of the motion judge, much of the information set forth in the affidavit was obtained as a result of Bradley's unlawfully obtained CSLI.  Accordingly, our task in evaluating the defendants' claim is to determine whether there are enough facts in the affidavit traceable to sources independent of the illegally obtained CSLI to establish probable cause for the search warrant.  See Commonwealth v. Tyree, 455 Mass. 676, 692 (2010) (evidence obtained during search pursuant to warrant obtained after illegal entry would be admissible if search warrant affidavit contained information supplying probable cause obtained from independent, untainted source).  Cf. Commonwealth v. Long, 454 Mass. 542, 552-553 (2009) (under Franks v. Delaware, 430 U.S. 154 [1978], where defendant shows affidavit supporting warrant

_____

(1981), S.C., 389 Mass. 411 (1983) (inevitable discovery rule is extension of independent source doctrine).  We decline the defendants' invitation to apply the clear and convincing evidence standard here.

includes affirmative misstatement, judge considers whether "affidavit purged of false material, establishes probable cause"). Cf. also Commonwealth v. James, 620 Pa. 465, 481 (2013) (court may look beyond affidavit supporting search warrant where objective of inquiry is "to determine whether a fact in the affidavit would be included or stricken when determining probable cause").

Frost's affidavit describes the following: an eyewitness account (provided by the victim's brother) of the shooting; police investigation into drug distribution from the victim's home and into the ultimate supplier of these drugs; identification of Bradley as a suspect and obtaining his call logs through an administrative subpoena; Bradley's statement giving Estabrook's name to police on August 2; Estabrook's statement on August 15, regarding his treatment at an area hospital in the early morning of the shooting, and review of his hospital record; Estabrook's statement on September 27, implicating himself and Bradley in the shooting; Marshall's grand jury testimony implicating Bradley in the robbery scheme; and forensic evidence linking Bradley to the shooting. Frost avers in his affidavit that he "specifically avoided" including information obtained pursuant to the § 2703(d) orders in delineating this evidence. Our review of the record persuades us that Frost succeeded in doing so.

The following information included in the affidavit was gathered before the Commonwealth initially obtained Bradley's CSLI without a search warrant, and therefore by definition was discovered independently of it. At approximately 3:55 A.M. on July 7, the victim was shot in his home. The victim's brother, who witnessed the shooting, told the police that three to four masked men in their early twenties had entered the home by kicking in a door to the kitchen; two of these intruders had firearms. One of them, the first intruder, was a white male with blue eyes and blonde hair. He was carrying a nine millimeter handgun, and ordered the victim and his brother to "get down on the ground." The victim refused, and hit the second intruder with a tea kettle. The second intruder was a heavyset white male dressed in a red shirt and black shorts with blue stripes. While the victim struggled with the second intruder, the first intruder, and perhaps another intruder as well, shot the victim. The intruders left the scene in a small sedan; the victim later died of a gunshot wound to the head.

When police executed a search warrant for the victim's residence that same day, they found more than $10,000 in cash in the victim's bedroom, more than one pound of marijuana, and what appeared to be drug ledgers. On July 10, 2012, Cappello told Frost and DeLucia that he lived with the victim, and that he regularly purchased and distributed marijuana. He also said

that he had purchased multiple pounds of marijuana from a supplier in Lynn named Ashley in the past, but that he had not done so since May, 2012, because when he last purchased marijuana from Ashley she was accompanied by a "scary" man introduced to him as the "thug." According to Cappello, the "thug" had many tattoos, including one on the back of his head that read "LYNN, MASS." Cappello believed that the "thug" provided security to Ashley's boy friend.

Frost and DeLucia obtained Ashley's telephone number from Cappello, and investigators learned through further investigation that "Ashley" was Ashley Marshall, and the "thug" was Bradley, who has a "LYNN, MASS" tattoo on the back of his head. Bradley's race and blue eyes were consistent with the description of the first intruder, and his probation record revealed a history of charges involving violence and firearms. During the police investigation, the district attorney's office obtained through administrative subpoenas call logs associated with the cellular telephones of Bradley, Bin, and Marshall.[24] These records revealed that at various intervals between 8 P.M.

---

[24] The defendants do not challenge the Commonwealth's obtaining or use of these records.

on July 6 and 6 <u>A</u>.<u>M</u>. on July 7, these individuals were in regular contact with one another.[25]

On July 25, the Commonwealth requested and obtained § 2703(d) orders, and as a result received the CSLI of Bradley and others soon thereafter. (See notes 5 & 14, <u>supra</u>.) The lettered list that follows summarizes information contained in Frost's affidavit that was obtained by the police after they had received Bradley's CSLI, but without exploiting the tainted CSLI.[26] See <u>Frodyma</u>, 393 Mass. at 442.

a. Bradley's interview with Frost and DeLucia on August 2. Bradley admitted to knowing Marshall and her boy friend, and stated that Estabrook occasionally used his cellular telephone.

---

[25] According to the affidavit, the telephone calls between Bradley's telephone and Marshall's telephone included the following: seven calls between 8:42 <u>P</u>.<u>M</u>. and 11:58 <u>P</u>.<u>M</u>. on July 6; four calls around the time of the shooting, from 3:50 <u>A</u>.<u>M</u>. to 3:58 <u>A</u>.<u>M</u>. on July 7; and six calls between 4:34 <u>A</u>.<u>M</u>. and 5:18 <u>A</u>.<u>M</u>. Bin and Gabriel Arias also exchanged telephone calls moments before the shooting occurred, and a call was placed from Bradley's telephone to Bin's telephone at 3:59 <u>A</u>.<u>M</u>.

[26] Although the discovery of certain information before the illegal search of Bradley's CSLI is sufficient to establish that information's independence from the illegality, see <u>Commonwealth</u> v. <u>Frodyma</u>, 393 Mass. 438, 441-442 (1984), the Commonwealth also may rely on evidence obtained after the illegal search if it can show that the evidence was independently obtained. Holding otherwise would contravene "the principle of the independent source doctrine that 'the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a <u>worse</u>, position [than] they would have been in if no police error or misconduct had occurred'". See <u>id</u>. at 443, quoting <u>Nix</u>, 467 U.S. at 443.

b.  Frost's August 15 interview of Estabrook.  Estabrook volunteered that on the night of the shooting he had dislocated his shoulder at a party in Salem and had been treated at Salem Hospital at 4:15 A.M. -- a time that was shortly after the shooting had occurred.  The hospital's surveillance videotape revealed that Estabrook appeared in the hospital lobby at approximately 5:15 A.M. on July 7, wearing a red T-shirt and black shorts, consistent with the description of the second intruder except for the lack of stripes on the shorts.  Medical records, obtained from the hospital through a grand jury subpoena, indicated that Estabrook was admitted at approximately 5:20 A.M., on July 7, and that he told those treating him that he had been "hit in the head with a tea kettle."

c.  Estabrook's recorded interview with Frost and DeLucia on September 27.  He told the investigators that the robbery of the victim was Bradley's idea, and that Bradley had lured him into the robbery scheme with the promise that they could steal some $40,000 from the victim.  He also identified other individuals involved in the crimes, including Bin, Arias, Steven Touch, and Sophan Keo.  Further, he stated that the group entered the victim's home with two firearms -- a nine millimeter handgun and a .45 caliber pistol; that while Bradley, Keo, and Touch waited outside, he, Arias, and Bin entered the home where Arias shot the victim in the head; that members of the group who

had been wearing latex gloves discarded the gloves as they fled the scene; and that later that morning, Estabrook, Bradley, Bin, Touch, and Arias met and urged one another to keep the details of the shooting a secret from the authorities.

d.  The November 15, 2012, grand jury testimony of Marshall, who had been granted immunity.[27]  Marshall stated that Bradley had asked her a few weeks before the shooting for a target to rob; that, on the evening of July 6, she suggested that he rob Cappello and showed Bradley photographs of what she believed to be Cappello's home; and that Bradley then left with a group of Asian males.[28]  When Bradley spoke to Marshall one or two weeks after the incident, he denied having entered the victim's home himself, but told her that other individuals had done so, and said words to the effect of, "What's done is done."

e.  Details concerning a latex glove.  On the day of the shooting police found a latex glove on a road approximately one quarter mile from the victim's home, and determined that Bradley

---

[27] Bradley argues that Marshall's grand jury testimony is tainted by the CSLI because, he contends, Marshall was given immunity on account of the fact that her own illegally obtained CSLI showed she was not in or near Billerica at the time of the shooting.  Bradley has no standing to challenge Marshall's grand jury testimony, and in any event, his argument is based on pure speculation:  the record offers no basis on which to reach any conclusion about why Marshall was granted immunity.

[28] According to Frost's affidavit, Steven Touch, Bin, and Sophan Keo are Asian males.

was a potential contributor to the glove's deoxyribonucleic acid (DNA) profile, and that the chances of the DNA of a randomly selected Caucasian male matching the DNA profile of the glove was 1 in 1.875 quadrillion.  In addition, the glove contained gunshot residue, indicating that the person wearing the glove fired a gun or was near a gun at the time it was fired.

An affidavit in support of a search warrant for CSLI must demonstrate "probable cause to believe [1] 'that a particularly described offense has been, is being, or is about to be committed, and [2] that [the CSLI being sought] will produce evidence of such offense or will aid in the apprehension of a person who the applicant has probable cause to believe has committed, is committing, or is about to commit such offense.'" Augustine, 467 Mass. at 256, quoting Commonwealth v. Connolly, 454 Mass. 808, 825 (2009).  The information just summarized, all contained in Frost's affidavit and all of which had a source separate and apart from the tainted CSLI, meets this two-pronged test.  As to the first prong, certainly the affidavit supplies probable cause to believe that the criminal offenses of murder and home invasion, among others, were committed at the victim's home, given that the victim's brother witnessed the incident and Estabrook confessed to details of the crimes.  With respect to the second prong, the independently obtained facts in Frost's affidavit (including Estabrook's September 27 statements to the

police detailing his and Bradley's involvement, and Bradley's DNA on the latex glove) provide probable cause to believe that Bradley and Estabrook were part of the group who perpetrated the home invasion and murder of the victim.  Accordingly, the affidavit establishes probable cause to believe that the CSLI would "produce evidence" of these offenses by indicating whether Bradley's cellular telephone, which also may have been used by Estabrook, was located near the victim's home on the night of the shooting and, therefore, whether Bradley (or Estabrook) was in the area of the shooting when it occurred.  Given that the 2013 search warrants for the CSLI were supported by probable cause based on evidence independent of the illegally obtained CSLI, suppression of evidence relating to Bradley's CSLI is not warranted.  See Frodyma, 393 Mass. at 440-441.

Conclusion.  The order of the Superior Court is affirmed with respect to the denial of the defendants' motions to suppress evidence of Bradley's CSLI.  The order is vacated with respect to the denial of the defendants' motions to suppress all statements, and the case is remanded to the Superior Court for further proceedings consistent with this opinion.

So ordered.