NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12216

COMMONWEALTH  vs.  KEITH HOBBS.

Suffolk.     December 7, 2018. - June 28, 2019.

Present:  Gants, C.J., Gaziano, Budd, Cypher, & Kafker, JJ.

Homicide.  Cellular Telephone.  Constitutional Law, Search and
    seizure, Probable cause, Confrontation of witnesses.
    Search and Seizure, Probable cause.  Probable Cause.
    Evidence, Disclosure of evidence, Hearsay, Admissions and
    confessions, Admission by silence.  Practice, Criminal,
    Capital case, Motion to suppress, Disclosure of evidence,
    Confrontation of witnesses, Conduct of prosecutor.

Indictments found and returned in the Superior Court
Department on October 26, 2012.

A pretrial motion to suppress evidence was heard by Charles
J. Hely, J.; the cases were tried before Janet L. Sanders, J.,
and a motion for a new trial, filed on May 8, 2017, was
considered by her.

Elizabeth Caddick for the defendant.
Cailin M. Campbell, Assistant District Attorney (Montez D.
Haywood, Assistant District Attorney, also present) for the
Commonwealth.

KAFKER, J.  A jury convicted the defendant, Keith Hobbs, of

murder in the first degree on the theory of deliberate

premeditation in connection with the shooting death of the victim, Demetrius Blocker.[1] The defendant raises several issues on appeal from his convictions and from the denial of his motion for a new trial. First, he argues that the motion judge erred in denying his pretrial motion to suppress the cell site location information (CSLI) used by the Commonwealth in this case. Three and one-half months of CSLI were collected, and CSLI from the date of the murder figured prominently at trial. Next, he alleges that several reversible errors were committed during the course of his trial. Specifically, the defendant argues (i) that the trial judge erred in permitting a police detective to testify to his observations of the defendant's gait; (ii) that the defendant's constitutional confrontation rights were violated when the trial judge admitted hearsay testimony that a particular cell phone number belonged to his friend; (iii) that the trial judge erred in admitting other hearsay testimony; and (iv) that the prosecutor's characterization of a photograph of the defendant as a "booking photo" amounted to misconduct. Finally, he argues that even if no one error, standing alone, is sufficient to warrant the reversal of his convictions, reversal is nonetheless warranted due to cumulative error.

---

[1] The jury also convicted the defendant on the related charge of possession of a firearm without a license.

For the reasons stated infra, we conclude that there has been no reversible error. After a thorough review of the record, we also find no reason to exercise our authority under G. L. c. 278, § 33E, to grant a new trial or to either reduce or set aside the verdict of murder in the first degree. We therefore affirm the defendant's convictions and the denial of his motion for a new trial.

Background. We summarize the facts that the jury could have found, reserving other facts for our discussion of specific issues. At approximately 4 P.M. on December 16, 2010, a sole gunman shot the victim in the arm, chest, and head while he sat in a parked car outside a housing complex in the Roxbury section of Boston. The shooter fled the scene on foot. Police and emergency medical personnel soon arrived and attempted to save the victim's life. These efforts proved unsuccessful, and the victim was pronounced dead shortly thereafter.

Police immediately began to canvas the crime scene. In the course of their investigation, police interviewed several witnesses at the scene who provided detailed descriptions of the suspected shooter. While their descriptions varied slightly, these witnesses consistently described the suspected shooter as a black- or brown-skinned male wearing a large black coat with a fur collar, dark jeans, and dark shoes. Several witnesses also stated that the man had a distinctive gait, describing his walk

as something akin to a limp.[2]  Police also learned that the suspect had been seen throwing an object into a nearby Dumpster as he left the scene following the shooting.

As police continued to search the crime scene, they discovered four spent shell casings near where the victim was shot and a .45 caliber handgun in the Dumpster identified by witnesses.  Subsequent ballistics testing revealed this firearm to be the murder weapon.  However, police were unable to recover any fingerprints from either the firearm or the shell casings.

Acting on information from witnesses who described the route the suspect took to flee the scene, police reviewed video footage from surveillance cameras that were located throughout the surrounding neighborhood.  Surveillance video recordings from the time frame immediately following the shooting captured footage of a man in a puffy black jacket with a fur collar, dark jeans, and dark sneakers who appeared to have a limp walking away from the crime scene.

Even with this information in hand, police were unable to immediately locate the suspect.  In an attempt to identify him, the police released one of the surveillance video recordings of the suspect to the public in February 2011.  To that end, the

---

[2] However, no witnesses from the scene were able to positively identify the defendant at trial.

recording was posted online and broadcast by television news stations. Several days after the video recording was released to the public, a man who identified himself as Michael Hobbs[3] telephoned Boston police and expressed his belief that the suspect in the recording was his brother, the defendant. Michael reiterated this identification in a follow-up interview with police, and again during subsequent testimony before a grand jury. Before the grand jury, he testified that he was able to identify the suspect as his brother due to the clothing the suspect was wearing and the distinctive way that the suspect walked.[4] In addition to identifying the defendant as the suspect in his initial call to police, Michael provided police with a telephone number for a cell phone that he understood to belong to the defendant.[5] Police then requested a court order requiring the defendant's cellular service provider to produce, among

---

[3] We refer to members of the Hobbs family by their first names to avoid confusion.

[4] Michael recanted these identifications at trial, stating that his brother walks "normal" and not in any distinctive way. He then testified that upon reviewing the surveillance footage further, he did not believe that the suspect in the footage was his brother. The Commonwealth confronted this recantation with his prior identifications and the grand jury testimony, which was admitted in evidence for impeachment purposes and as substantive evidence.

[5] Trial testimony revealed that although this cell phone was purchased and owned by the defendant's former girlfriend, the defendant used it as his personal cell phone at all times relevant to this case.

other information, the historical CSLI from the defendant's cell phone spanning several months surrounding the day of the killing.  The application was granted.  The CSLI from the date of the killing was introduced at trial and showed that the defendant's cell phone was located in the general vicinity of the crime scene at and around the time of the killing.

The Commonwealth introduced further evidence identifying the defendant as the suspect in the surveillance video footage through Roseanne Robinson, the wife of the defendant's friend, Bonae Swain-Price.  Robinson testified that the defendant and her husband knew each other well and that the defendant had lived with her family for a period of time.[6]  She explained that, having observed the defendant's gait on prior occasions, she believed that one of his legs turned inward as he stepped forward, giving the appearance that he walked with a limp.  She also testified that, based at least in part on her familiarity with the defendant's gait, she recognized the defendant as the suspect in the surveillance video recording that the police had released to the public.  After watching the video recording, she remarked to her cousin that she thought the suspect in the recording looked like the defendant, and later told the defendant directly that she had "seen him on the news."  In

---

[6] Roseanne Robinson also testified that her husband used the defendant's cell phone from time to time.

addition to her testimony regarding his gait, Robinson testified that she believed the suspect in the recording to be the defendant due to the clothing that the suspect was wearing. She explained that the defendant often wore dark shoes and dark jeans, and that her husband had given the defendant a large black jacket with a fur collar at some point before the date of the killing. Evidence also revealed that Swain-Price had possessed a .45 caliber handgun that matched the general description of the murder weapon, and that Swain-Price possessed this weapon while the defendant lived with Swain-Price and his family.

Finally, the lead detective in the case testified that he had recently reviewed a video recording of the defendant walking and had observed that the defendant had "a distinctive walk," which appeared to him to be a limp.[7]

After the case was submitted, the jury returned guilty verdicts on both charges and the defendant was subsequently sentenced to life in prison without the possibility of parole. The defendant now appeals.

---

[7] Several other witnesses, however, testified that the defendant did not walk in a distinctive manner. For example, the defendant's sister, Nicole, and his former girlfriend both testified that they had never noticed anything distinctive about the defendant's gait during the time that they had known him.

Discussion. 1. Motion to suppress CSLI. The defendant appeals from the denial of his pretrial motion to suppress. On March 17, 2011, approximately three months after the killing in this case, and after identifying the defendant as a suspect, the Commonwealth filed an application, pursuant to 18 U.S.C. § 2703, requesting a court order that would require the defendant's cellular service provider to produce, among other information, the historical CSLI from the defendant's cell phone spanning December 1, 2010, through March 15, 2011.[8] The application was granted. A review of the CSLI revealed that the defendant's cell phone was in the vicinity of the crime scene at and around the time of the killing. Before trial, the defendant moved to suppress the CSLI, arguing that the Commonwealth did not have probable cause to obtain this information. The motion was denied, and the CSLI was eventually admitted in evidence at trial.

When reviewing a ruling on a motion to suppress, we "accept the judge's subsidiary findings of fact absent clear error but

_____

[8] Cell site location information (CSLI) refers to a cell phone "service record or records that contain information identifying the base station towers and sectors that receive transmissions from a [cellular] telephone" (quotation and citation omitted). Commonwealth v. Augustine, 467 Mass. 230, 231 n.1 (2014) (Augustine I), S.C., 470 Mass. 837 and 472 Mass. 448 (2015). Once obtained, law enforcement can use this information to identify the approximate location of the cell phone based on the cell phone's communication with a particular cell site. See id. at 238.

conduct an independent review of his ultimate findings and conclusions of law" (quotation and citation omitted). Commonwealth v. White, 475 Mass. 583, 587 (2016). Accordingly, we make an "independent determination of the correctness of the judge's application of constitutional principles to the facts as found" (citation omitted). Id.

Before the government may request and obtain historical CSLI, it ordinarily must first obtain a warrant based on probable cause.[9] See Carpenter v. United States, 138 S. Ct. 2206, 2221 (2018) (warrant required under Fourth Amendment to United States Constitution); Commonwealth v. Augustine, 467 Mass. 230, 232 (2014) (Augustine I), S.C., 470 Mass. 837 and 472 Mass. 448 (2015) (warrant required under art. 14 of Massachusetts Declaration of Rights). Because the Commonwealth in this case requested the historical CSLI several years before we first articulated this warrant requirement in 2014, in Augustine I, it did not obtain a warrant.[10] The Commonwealth may

---

[9] The Commonwealth need not obtain a warrant, however, if it requests six hours or less of "telephone call" CSLI. Commonwealth v. Estabrook, 472 Mass. 852, 858 & n.12 (2015).

[10] Although the Commonwealth requested the historical CSLI in 2011, the defendant's trial did not occur until after we announced the warrant requirement in Augustine I. Moreover, the defendant challenged the sufficiency of the Commonwealth's application pursuant to 18 U.S.C. § 2703 before trial. The warrant requirement therefore applies in this case. Augustine I, 467 Mass. at 257 (warrant requirement applies to "cases in

nevertheless still satisfy the warrant requirement if it can establish that its "application for the § 2703[] order met the requisite probable cause standard of art. 14." Augustine I, supra at 256.

An affidavit in support of a search warrant for historical CSLI must "demonstrate 'probable cause to believe [1] that a particular described offense has been, is being, or is about to be committed, and [2] that [there is a substantial basis to believe that the CSLI being] sought will produce evidence of such offense or will aid in the apprehension of a person who the applicant has probable cause to believe has committed, is committing, or is about to commit such offense.'" Commonwealth v. Estabrook, 472 Mass. 852, 870 (2015), quoting Augustine I, 467 Mass. at 256. See Commonwealth v. Robertson, 480 Mass. 383, 387 (2018). See also Commonwealth v. Holley, 478 Mass. 508, 521 (2017).

We review the affidavit de novo to determine if it "satisfies the probable cause standard." Robertson, 480 Mass. at 386. Ordinarily, we look to the "four corners of the affidavit to determine whether . . . [the] application establishes probable cause" (quotation omitted). Estabrook, 472

which a defendant's conviction is not final, that is, to cases pending on direct review in which the issue concerning the warrant requirement was raised").

Mass. at 866.  The affidavit is to be evaluated "as a whole and in a commonsense and realistic fashion," and not "parsed, severed, and subjected to hypercritical analysis" (citations omitted).  Robertson, supra.  "[I]nferences drawn from the affidavit need only be reasonable, not required" (citation omitted).  See Commonwealth v. Augustine, 472 Mass. 448, 455 (2015) (Augustine II).  "[N]o showing that the inferences are correct or more likely true than not true is required."  Robertson, supra at 387.

The affidavit accompanying the Commonwealth's § 2703 application in this case included the following information. Boston police officers responded to a report of a gunshot victim in Roxbury on December 16, 2010.  Upon arriving at the crime scene, police found the victim lying on the ground and suffering from multiple gunshot wounds.  The victim was later pronounced dead at a local hospital.  Four .45 caliber shell casings were found at the scene, and several witnesses described the shooter as a black Hispanic male with curly hair and a thin beard, who was wearing a puffy black jacket with a fur collar.  Witnesses also reported seeing the shooter throw an object into a nearby Dumpster.  Police thereafter recovered from the Dumpster a .45 caliber firearm that was still warm, indicating to police that it had recently been fired.  Acting on information from witnesses who described the route the suspect took following the

shooting, police reviewed footage from surveillance cameras, located in the surrounding neighborhood, that had captured images of a black or black Hispanic male in a puffy black jacket with a fur collar walking down the street. On February 25, 2011, after police released this surveillance footage to the public, the defendant's brother telephoned police and stated that, based on his independent review of the surveillance footage, he believed that the man in the footage wearing the puffy black jacket with a fur collar was the defendant. The defendant's brother also stated that the defendant tended to "hang[] out around" the area in the vicinity of the street on which the victim lived. Additionally, the defendant's brother told police that he did not know his brother's whereabouts, as he had not seen the defendant in several months and his family could not get in touch with him. Finally, the defendant's brother provided police with a telephone number for a cell phone that he understood to belong to the defendant. The defendant's association with the cell phone's number was subsequently corroborated by the defendant's former girlfriend.

The defendant argues that the foregoing information was insufficient to satisfy the requisite probable cause standard. We disagree. As to the first requirement, based on the facts discussed supra, there is no question that the affidavit demonstrated probable cause to believe that "a particularly

described offense ha[d] been . . . committed," and that the defendant had committed the offense.  Augustine II, 472 Mass. at 453, quoting Augustine I, 467 Mass. 256.  Cf. Robertson, 480 Mass. at 387 (probable cause to believe particular offense occurred where police found victim suffering from gunshot wound and percipient witnesses gave accounts of shooting to police).

Whether the affidavit satisfied the second requirement, that there be a substantial basis to believe that the sought-after CSLI "will produce evidence of such offense or will aid in the apprehension of a person who the applicant has probable cause to believe has committed . . . such offense," is a closer question.  Augustine II, 472 Mass. at 453, quoting Augustine I, 467 Mass. 256.  See Robertson, 480 Mass. at 387; Holley, 478 Mass. at 521.  The defendant argues that the affidavit fails to satisfy this requirement (i) because it did not establish the requisite nexus between the sought-after evidence and the crimes, and (ii) because its request for CSLI was unconstitutionally overbroad.  We address each argument in turn.

a.  Nexus.  The defendant first argues that the affidavit categorically failed to establish the requisite nexus "between the crime[s] alleged and the article to be search or seized" (quotation and citation omitted), White, 475 Mass. at 588, because there was no assertion in the affidavit that the defendant actually used or possessed his cell phone during the

commission of the crimes. We disagree, as neither this court nor the United States Supreme Court has required such a showing to satisfy the nexus requirement where the sought-after evidence is CSLI. See, e.g., Carpenter, 138 S. Ct. at 2221; Estabrook, 472 Mass. at 870; Augustine II, 472 Mass. at 453.

The affidavit in support of a search warrant application must demonstrate a nexus between "the crime [for which there is probable cause to search] and the items sought, and the location to be searched." Commonwealth v. Alexis, 481 Mass. 91, 102 (2018). See Holley, 478 Mass. at 521. The nexus "need not be based on direct observation" and it "may be found in the type of crime, the nature of the [evidence] sought, and normal inferences as to where such evidence may be found" (emphasis added; quotation omitted). White, 475 Mass. at 589. To establish the requisite nexus, the affidavit must demonstrate a substantial basis to conclude that "the items sought are related to the criminal activity under investigation, and that they reasonably may be expected to be located in the place to be searched at the time the search warrant issues" (citation omitted). Alexis, supra. See Holley, supra; Augustine II, 472 Mass. at 455.

In the context of historical CSLI, the sought-after evidence is the location of the cell phone itself, not what information may be found in the cell phone's contents. That

location can also be reasonably expected to be the location of the person possessing the cell phone. We have repeatedly recognized that cell phones have become "an indispensable part of daily life and exist as almost permanent attachments to [their users'] bodies" (quotations omitted). Commonwealth v. Almonor, 482 Mass. 35, 45 (2019), quoting Augustine I, 467 Mass. at 245-246. "Cell phones 'physically accompany their users everywhere' such that tracking a cell phone results in 'near perfect surveillance' of its user." Almonor, supra, quoting Carpenter, 138 S. Ct. at 2218; Augustine I, supra at 246. Accordingly, in light of the inseparability of person from cell phone, an affidavit establishing that a suspect committed a crime and that the suspect was known to own or use a particular cell phone, along with the reasonable inferences drawn therefrom, demonstrates a substantial basis to believe that the CSLI from that cell phone was "related to the criminal activity under investigation, and that [the CSLI] reasonably may be expected to be located in the place to be searched at the time the search warrant issues" (citation omitted). Alexis, 481 Mass. at 102. More precisely, the location of a suspect's cell phone at the time of the criminal activity provides evidence directly related to his or her participation, or lack thereof, in the criminal activity, and the location of the cell phone at

that time can reasonably be expected to be found in the CSLI records requested.

Consequently, there is a sufficient nexus between the criminal activity for which probable cause has been established and the physical location of the cell phone recorded by the CSLI of the person the applicant has probable cause to believe has committed the offense, at least for the time and place of the criminal activity. A direct observation of a suspect's actual use of the cell phone during the commission of the crime is thus not required to establish the requisite nexus between the crime and CSLI.[11] See Estabrook, 472 Mass. at 870 (no mention of

---

[11] Indeed, a request for CSLI without a direct observation of a suspect's use of the cell phone during the commission of the crime does not raise the same nexus concerns raised in other contexts. For example, in Commonwealth v. White, 475 Mass. 583, 591-592 (2016), we held that when police seek access to the contents of a cell phone, it is not enough for the averring officer to state that "given the type of crime under investigation, the [cell phone] likely would contain evidence" of the crime. Rather, we held that "even where there is probable cause to suspect the defendant of a crime, police may not seize or search his or her [cell phone] to look for evidence unless they have information establishing the existence of particularized evidence likely to be found there." Id. at 590-591. Critical to our decision, however, was that the search that law enforcement seeks to conduct is of a "computer-like" device. Id. at 589. See Commonwealth v. Holley, 478 Mass. 508, 524 (2017), quoting Commonwealth v. Dorelas, 473 Mass. 496, 502 (2016) ("We have cautioned that 'given the properties that render [a modern cell phone] distinct from the closed containers regularly seen in the physical world, a search of its many files must be done with special care and satisfy a more narrow and demanding standard'"). In these circumstances, without a particularized showing of facts demonstrating that the device

defendant's cell phone use in affidavit, but concluding affidavit established probable cause that CSLI would produce evidence of crime by indicating "whether [defendant's cell phone] . . . was located near the victim's home on the night of the shooting and, therefore, whether [defendant] was in the area of the shooting when it occurred").  See also United States v. Hunt, 718 Fed. Appx. 328, 332 (6th Cir. 2017) (probable cause and requisite nexus for CSLI where affidavit demonstrated that location of defendant's cell phone would corroborate informant's assertions that defendant owned cell phone and frequently traveled to Chicago to purchase drugs); United States v. Gibbs, 547 Fed. Appx. 174, 179 (4th Cir. 2013) (per curiam), cert. denied, 573 U.S. 949 (2014) (probable cause established where affidavit established existence of criminal activity, link between person whose cell phone was to be tracked and that criminal activity, and whether location information would likely reveal evidence of crime); United States vs. Christian, U.S. Dist. Ct., No. 1:16-cr-207 (LMB) (E.D. Va. May 24, 2017), aff'd, 737 Fed. Appx. 165 (4th Cir. 2018) (per curiam), cert. denied, 139 S. Ct. 1204 (2019) (no requirement that affidavit

---

contains evidence of a crime, law enforcement would be permitted to review vast amounts of sensitive and private data without establishing the necessary nexus between the cell phone and the crime.  White, supra at 589-592.  These same concerns are not present in the context of CSLI, where the cell phone's location, and not its contents, is sought.

demonstrate cell phone itself was used to conduct criminal activity because, "[i]n the context of a [cell phone location] warrant, the place to be searched is the subject [cell] phone, and the item to be seized is location data.  Therefore, the nexus requirement is satisfied by an inference that the subject [cell] phone will be a source of location information regarding criminal activity").  See generally Alexis, 481 Mass. at 102 ("There must be probable cause to conclude not only that an individual committed a crime, but also that there is a nexus between the crime and the items sought, and the location to be searched").

In the instant case, the affidavit demonstrated probable cause that the defendant committed the killing, and also established that he possessed a cell phone.  After the footage of the suspect was released to the public, a man called police and positively identified the suspect in the footage as being his brother, the defendant.  The defendant's brother also gave police a telephone number that he claimed was the telephone number for the defendant's cell phone.  The defendant's association with the telephone number was thereafter corroborated by the defendant's former girlfriend.  These facts demonstrated the requisite nexus between the CSLI and the killing.  Cf. Estabrook, 472 Mass. at 870.

b.  Overbreadth.  The defendant next argues that the application's request for three and one-half months of historical CSLI was unconstitutionally overbroad because the affidavit did not establish probable cause for the entire amount of data.[12]  In effect, the defendant argues that the Commonwealth's affidavit failed to furnish the requisite nexus between the full three and one-half months of CSLI and the crimes that occurred.  Accordingly, he argues, the search was unreasonable under the Fourth Amendment and art. 14.

Such an extended collection of CSLI, both before and after the killing, raises significant constitutional questions.  See Carpenter, 138 S. Ct. at 2217 (noting that review of extended amounts of CSLI can "provide[] an intimate window into a person's life, revealing not only his [or her] particular movements, but through them his [or her] familial, political, professional, religious, and sexual associations" [quotation and citation omitted]); Augustine I, 467 Mass. at 248-249.  Indeed, the sensitive and private nature of this type of data is

---

[12] The Commonwealth argues, and the motion judge concluded, that in light of the evidence of the defendant's involvement in the crimes, as well as his having escaped apprehension and his itinerancy in the months following the shooting, the affidavit demonstrated probable cause that the full three and one-half months of CSLI "[would] aid in the apprehension of a person who the applicant has probable cause to believe has committed . . . such offense" (citation omitted).  See Commonwealth v. Augustine, 472 Mass. 448, 453 (2015).

precisely why both this court and the United States Supreme Court have held that the Fourth Amendment and art. 14 require a warrant based on probable cause before this data may be obtained by the government.  See Carpenter, supra; Augustine I, supra. We recognize, however, that defining the permissible parameters of time for CSLI searches that are justified by probable cause is difficult.  This is a "fact-intensive inquiry, and must be resolved based on the particular facts of each case."  Holley, 478 Mass. at 522, quoting Commonwealth v. Morin, 478 Mass. 415, 426 (2017).

The affidavit in this case clearly demonstrated a substantial basis to believe that historical CSLI from the defendant's cell phone would provide relevant evidence related to the crimes and his flight from the crime scene.  The affidavit therefore established, at a minimum, the requisite nexus for the CSLI for the date of the killing, December 16, 2010.  As we have noted, however, the Commonwealth sought CSLI for a far greater period of time than the day of the killing; they sought and received three and one-half months of CSLI. This extended request was in part the result of the failure to identify the defendant as a suspect for nearly two and one-half months, and the absence of any evidence of his current location once he was identified as a suspect.  Although the delay in identifying the defendant as a suspect and the difficulty in

apprehending him made it difficult to define the permissible scope of the CSLI request, we assume, without deciding, that at least some of this three and one-half month period of time was unnecessary to either the investigation or apprehension of the defendant.

The question then presented is what a court should suppress when the requisite nexus exists for historical CSLI spanning a shorter period of time than that authorized by the search warrant -- or in this case, the § 2703 order. More specifically, does either the Fourth Amendment or art. 14 require total suppression of the entire amount of CSLI collected, or is the proper remedy to suppress only the CSLI for which there is not the requisite nexus to the crime? Given the uncertainty in the case law regarding overbroad requests for CSLI, and the limited briefing before the court on the issue presented, we proceed cautiously on this issue. We conclude that, in these circumstances, where the requisite nexus for probable cause clearly exists for a reasonable period of time encompassing the commission of and flight from the crime, as well as the defendant's immediate apprehension,[13] the CSLI for

_____

[13] We once again emphasize the significant constitutional issues raised by the collection of extended amounts of historical CSLI, and the importance of limiting the requests accordingly. See Augustine I, 467 Mass. at 248-249. As we have noted, law enforcement may have other available alternatives to

this period of time need not be suppressed so long as the CSLI for which there is not the requisite nexus to the crime is not relied on or otherwise exploited by the Commonwealth at trial.

Our decision in Holley is instructive in this regard. There, the defendant challenged a search warrant authorizing the search of a cell phone for seventeen days' worth of broad categories of electronic records, including text messages. Holley, 478 Mass. at 524.  At trial, however, the Commonwealth only introduced two days' worth of text messages, which had been redacted such that only text messages relevant to the crimes were put before the jury.  Id. at 525.  Having already concluded that the requisite nexus existed between the text messages and the crimes, id. at 522-524, and that therefore the Commonwealth had probable cause to search the text messages, we held that the defendant was not prejudiced by the broad scope of the warrant, as the text messages were "sufficiently limited in content and scope such that the Commonwealth did not capitalize on the lack of particularity in the warrant."  Id. at 525.

The case here is analogous to Holley.  Although the § 2703 order in this case should have been much more limited in its scope based on facts set forth in the affidavit, the trial

---

aid in the apprehension of suspects, such as a warrant for the real-time location data of the suspect's cell phone.  See generally Commonwealth v. Almonor, 482 Mass. 35 (2019).

record reveals that the only CSLI that was meaningfully used and relied on by the Commonwealth at trial was from the date of the killing.[14]  To that end, maps showing the approximate locations of the defendant's cell phone on December 16, 2010, were introduced in evidence and were the subject of the testimony from several witnesses.  Additionally, references to CSLI during the Commonwealth's opening statement and closing argument were limited to CSLI from the date of the killing.  As in Holley, 478 Mass. at 525, on this record, the CSLI relied on at trial was limited in content and scope such that the Commonwealth did not capitalize on the overbreadth of the § 2703 order.  The defendant therefore suffered no prejudice from the broad scope of the warrant.[15]  See id.  See also United States v. Abboud, 438

---

[14] Although CSLI and other cell phone information from the arguably overbroad aspects of the § 2703 order were introduced in evidence at various other points at trial, this evidence was never discussed by the witnesses or relied on by the Commonwealth.  Indeed, this evidence was not incriminating, and the defendant has not identified how its admission prejudiced him in any way.  There was also ample other evidence of the defendant's guilt, including the eyewitness testimony, the surveillance recording, and the identifications by his brother and his friend's wife.  The improperly admitted evidence therefore had no effect on the jury or their findings.  Accordingly, we are satisfied that the admission of this evidence was harmless beyond a reasonable doubt.

[15] We note that our approach here is also consistent with the principles underlying the severance doctrine, a remedy which has traditionally been applied when a "search warrant is issued to search a certain place for several items, but is later determined that some but not all of those items are described

F.3d 554, 576 (6th Cir.), cert. denied, 549 U.S. 976 (2006)

(where probable cause existed only for defendant's business

---

with sufficient particularity, or that probable cause had been established as to some but not all of the items described."  2 W.R. LaFave, Search and Seizure § 4.6(f), at 814 (5th ed. 2012).  In these circumstances, we have held that "the infirmity of part of a warrant requires the suppression of evidence seized pursuant to that part of the warrant . . . but does not require the suppression of anything described in the valid portions of the warrant."  Commonwealth v. Lett, 393 Mass. 141, 144-145 (1984).  See Aday v. Superior Court of Alameda County, 55 Cal. 2d 789, 796-799 (1961) (seminal decision on severance).  We have, in this context, been "persuaded that 'it would be harsh medicine indeed if a warrant which was issued on probable cause and which did particularly describe certain items were to be invalidated in toto merely because the affiant and magistrate erred in seeking and permitting a search for other items as well.'"  Lett, supra at 145, quoting 2 W.R. LaFave, Search and Seizure § 4.6(f), at 111-112 (1978 & Supp. 1984).

In determining whether the severance doctrine applies, courts have been careful to consider whether total suppression of the evidence seized as a result of the search would effectuate the purposes of the exclusionary rule.  Lett, 393 Mass. at 145.  See United States v. Cook, 657 F.2d 730, 735 (5th Cir. 1981).  These purposes include "the deterrence of unlawful police conduct, the dissociation of the courts from such misconduct, and the preclusion of the benefit to the prosecution from unconstitutional police activity."  Lett, supra.  See United States v. Christine, 687 F.2d 749, 757 (3d Cir. 1982); Cook, supra.  "Where none of these purposes will be served, rigid adherence to the exclusionary rule only can frustrate the public interest in admitting the evidence obtained."  Lett, supra.  See United States v. Fitzgerald, 724 F.2d 633, 636 (8th Cir. 1983), cert. denied, 466 U.S. 950 (1984) ("In deciding whether particular evidence should be suppressed in any given case, then, courts properly weigh the deterrent effect of the suppression against its societal costs").  In these circumstances, severance and partial, rather than total, suppression can "effect[] a pragmatic balance" between the "cost to society of excluding probative evidence" and the deterrent effect of suppression.  Lett, supra.  See Christine, supra at 758.

records covering three-month period in 1999, no prejudice suffered from overbroad search warrant authorizing search of records from January 1996 through May 2002 because records from overbroad portion of warrant were not relied on by government at trial).

In sum, we conclude as a matter of law that the requisite nexus for probable cause existed to support the collection and review of CSLI from the defendant's cell phone for a reasonable period of time encompassing the commission of, and flight from, the killing in this case. The search of and use of this CSLI evidence was thus justified and separable from the overbroad portions of the CSLI authorized by the § 2703 order for which there was no nexus articulated by the Commonwealth between the CSLI and the crimes, as there was no attempt to exploit the overbroad portions of the CSLI evidence at trial. Cf. Holley, 478 Mass. at 525. We therefore cannot say that the motion judge erred in denying the defendant's motion to suppress the CSLI in this case.

We turn now to the alleged errors at trial.

2. Admission of detective's testimony. Shortly before trial, the Commonwealth disclosed its intention to admit prison surveillance video footage (prison video) that had recently been captured and that purported to show that the defendant had a distinctive gait while he was incarcerated. The Commonwealth

offered that this evidence would allow the jurors to compare the defendant's gait with the gait of the suspect in the surveillance video footage from the day of the shooting that would be admitted in evidence. The defense objected, arguing that the new evidence was not timely disclosed to the defense and that the prejudicial effect of admitting video footage of the defendant in a prison setting years after the shooting in this case substantially outweighed its probative value. The trial judge agreed with the defense as to the latter argument, and precluded the Commonwealth from admitting the prison video. The trial judge did, however, permit the lead detective in the case to testify about his observations of the defendant's gait in the prison video without making reference to the fact that the video footage he reviewed was of the defendant in prison. Further, the trial judge did not allow the detective to opine as to whether he believed the defendant was the same man as the suspect in the surveillance footage.

At trial, the detective provided the following description of the defendant's gait as seen in the prison video:

> "[The defendant] had a distinctive walk. It appeared that he had a limp with his left leg going out to the side a little bit. Again, not again, he was clearly pigeon-toed to me with his left leg pointing inward. He seemed to have something with his right foot where it appeared at times that he was walking on the inside of his foot, pointing [his] right foot outwards."

Following this testimony, the Commonwealth asked the detective to describe the gait of the suspect in the surveillance footage from the day of the shooting. He described the suspect's gait as follows:

> "I observed what I believe to be a limp with his left leg coming out a little bit. I believe I observed that [the suspect] appears to be pigeon-toed with his left foot pointing inwards, and I also observed what I believe to be, it appears as [if] he's walking on the inside of his foot pointing his right foot outwards."

The detective went on to comment on the appearance of the suspect in the video recording, describing that he observed that the suspect was wearing "dark-colored jeans, a black coat with a fur collar," along with "black sneakers, which appeared to have some red on them, and he appeared to be wearing a hooded sweatshirt with perhaps white stripes or white designs on the hood of the sweatshirt." This testimony concluded without the detective ever offering an opinion as to whether he thought the defendant was the suspect in the surveillance video footage.

On appeal, the defendant argues that the trial judge abused her discretion in admitting this testimony and that this error warrants a reversal of his convictions. We disagree.

First, the defendant argues that the detective's testimony describing his observations about the defendant's gait as seen in the prison video was error because the Commonwealth did not timely disclose its intention to admit this evidence at trial.

We discern no error.  A trial judge "possesse[s] considerable discretion in dealing with the problem created by the prosecution's late disclosure" of evidence.  Commonwealth v. Hamilton, 426 Mass. 67, 70 (1997).  When the ground for the exclusion of evidence involves late disclosure by the prosecution, "without any showing of bad faith on [the prosecution's] part . . . a defendant is required to show material prejudice from the disclosure before a new trial can be considered."  Id.  See Commonwealth v. Bresilla, 470 Mass. 422, 432 (2015).  The defendant has demonstrated neither that the Commonwealth acted in bad faith nor that he was materially prejudiced by the late disclosure of this evidence.  The prison video was turned over to the defense on May 23, 2015, but the detective did not testify until more than two weeks later on June 10, 2015.  As the trial judge noted, defense counsel had a full and fair opportunity to consult with his expert and to prepare to cross-examine the Commonwealth's witness on this issue.  The trial judge therefore did not abuse her discretion in allowing the detective to testify on this basis.

Next, the defendant argues that even if this evidence was timely, the detective's testimony was improper because he effectively identified the defendant as the suspect in the surveillance footage.  Because the defendant did not object to the testimony on these grounds at trial, we review any error for

substantial likelihood of a miscarriage of justice.
Commonwealth v. Almeida, 479 Mass. 562, 568 (2018) (where
"grounds for objection" made at trial differ from those raised
on appeal, "the standard of review that applies to [the] claim
is whether there was a substantial likelihood of a miscarriage
of justice").  Where the jury are capable of "viewing [a]
videotape and drawing their own conclusions regarding whether
the [individual] in the videotape was the defendant," opinion
testimony from a police officer as to the identity of the
individual in the recording is ordinarily not admissible.
Commonwealth v. Austin, 421 Mass. 357, 366 (1995).  See
Commonwealth v. Pina, 481 Mass. 413, 429-430 (2019) (noting that
"testimony of a police officer, with its possibly greater
imprint of authority as to identification of a defendant . . .
is not permissible absent some compelling reason that the police
officer is in a better position than the jury to identify the
defendant").  See also Commonwealth v. Wardsworth, 482 Mass.
454, 476 (2019).  Here, however, although the detective
described the defendant's gait and the gait of the suspect in
the surveillance video recording in nearly identical terms, he
did not directly offer his opinion as to whether he believed
that the two gaits were similar or that he believed the
defendant was the suspect in the surveillance video footage.
Rather, the officer merely described his observations of the

defendant's gait in both of the video recordings he observed. The jury were free to determine whether they believed the detective's description of the defendant's gait was similar to the gait of the suspect in the surveillance video footage -- a video recording that they had the repeated opportunity to see. There was no identification made by the detective, and there was therefore no error.[16]

Finally, the defendant argues that notwithstanding the detective's description of the defendant's gait in the prison video, his description of the gait and the appearance of the suspect in the surveillance video footage from the day of the shooting improperly invaded the province of the jury to draw their own conclusions as to the suspect's appearance and gait. This is a closer question, as the officer could have been limited to describing the defendant's gait in the prison video and the jury left to make its own comparison. Because the defendant did not object to this specific testimony, we review any error to determine whether it created a substantial

---

[16] Even were we to assume that this testimony amounted to impermissible lay opinion as to the identity of the suspect in the surveillance footage, the error did not create a substantial likelihood of a miscarriage of justice, as it was cumulative of other identifications made by his brother and Robinson. Cf. Commonwealth v. Pina, 481 Mass. 413, 429-430 (2019) (no prejudicial error where police officer's opinion that defendant was suspect in surveillance video recording was cumulative of other identification evidence properly admitted); Commonwealth v. Vacher, 469 Mass. 425, 441-442 (2014).

likelihood of a miscarriage of justice.  Commonwealth v. Barry, 481 Mass. 388, 407 (2019).

Even if it was error to admit this testimony, it is clear that it did not likely influence the jury's conclusion.  See Commonwealth v. Brown, 474 Mass. 576, 586 (2016) (no substantial likelihood of miscarriage of justice where erroneously admitted evidence did not likely influence jury's conclusion).  The amount of evidence regarding the appearance of the suspect in the surveillance video footage was substantial.  In addition to the fact that the jury were able to view the footage themselves, several witnesses from the scene of the shooting testified that the suspect was wearing a large black coat with a fur collar, dark jeans, and dark shoes.  Several others also testified that the suspect walked with what appeared to be a limp.  Additionally, each of the witnesses who was shown the surveillance video recording of the suspect identified the suspect in the recording as the man they had seen at the crime scene.  The detective's testimony describing the gait and appearance of the suspect in the surveillance video footage was therefore cumulative of other evidence at trial.  We are satisfied that his testimony did not likely influence the jury,

and therefore did not create a substantial likelihood of a miscarriage of justice.[17]

3. Right to confront witnesses. During the detective's testimony, the Commonwealth introduced call logs listing telephone numbers with which the defendant's cell phone had connected with at various times. The Commonwealth questioned the detective about a particular telephone number with which the defendant's cell phone had connected several times on the date of the killing. In the course of the questioning, the detective testified that this telephone number belonged to Swain-Price. Earlier trial testimony showed that Swain-Price and the defendant were friends, and that the defendant had been living with Swain-Price at or around the time of the shooting. Although the detective testified that the number belonged to Swain-Price, no evidence was offered demonstrating how he had learned this information. At sidebar, the Commonwealth disclosed that Swain-Price himself had told the detective that

---

[17] In his motion for a new trial, the defendant also argues that his trial counsel was ineffective for failing to object to the introduction of this evidence on this basis. As explained supra, even assuming error, the admission of this evidence did not create a substantial likelihood of a miscarriage of justice. Accordingly, counsel was not ineffective for failing to object to this testimony. See Commonwealth v. Lessieur, 472 Mass. 317, 326, cert. denied, 136 S. Ct. 418 (2015) (claims of ineffective assistance of counsel reviewed to determine whether there "exists a substantial likelihood of a miscarriage of justice").

it was his telephone number during a police interview.  Swain-Price did not testify at trial.

On appeal, the defendant argues that because the detective's knowledge of Swain-Price's connection to the telephone number was based on testimonial hearsay and because Swain-Price did not testify, the admission of this testimony violated the defendant's confrontational rights under the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights.  The Commonwealth concedes that the admission of this testimony was error, and we agree.  Defense counsel objected to this testimony, although not on the constitutional grounds argued before us on appeal.  We therefore review to determine whether its admission constituted prejudicial error.  See Commonwealth v. Imbert, 479 Mass. 575, 579 (2018); Commonwealth v. Grady, 474 Mass. 715, 720 (2016).

Although the admission of this testimony was error, we conclude that it was not prejudicial, because there is no doubt that it "did not influence the jury, or had but very slight effect" (citation omitted).  Commonwealth v. Cruz, 445 Mass. 589, 591 (2005).  Indeed, the defendant has not identified, and we cannot find, how the introduction of this testimony prejudiced him in any way.  The defendant asserts that this evidence provided a critical link between the defendant and the murder weapon because there was testimony that Swain-Price owned

a .45 caliber handgun that looked similar to the murder weapon. We are not persuaded that a call log purporting to show that the defendant called Swain-Price on the date of the killing linked the defendant to the murder weapon. At most, the call log established that the defendant knew Swain-Price. This fact, however, had already been established by other evidence at trial, including the fact that the defendant lived with Swain-Price for a period of time. We are therefore confident that that evidence had no influence on the jury. Cruz, supra.

4. Hearsay testimony of defendant's sister. One of the Commonwealth's witnesses, Robinson, testified to a conversation between the defendant and Swain-Price that she overheard on the day the police released surveillance footage of the shooting suspect to the public. Specifically, Robinson testified that she heard the defendant tell her husband that the defendant's sister, Nicole, had called him earlier that day and told him that she had "seen him on [television]." Defense counsel lodged an objection to this testimony, arguing that it was impermissible hearsay. In response, the trial judge prohibited the prosecutor from inquiring further on Nicole's identification of the defendant and then instructed the jury on the general definition and parameters of hearsay. The judge did not, however, explicitly strike the testimony or give a limiting instruction.

On appeal, the defendant argues that Robinson's testimony amounted to reversible error due to its potential prejudice. As defense counsel objected to this testimony, we review for prejudicial error. See Imbert, 479 Mass. at 579.

The testimony at issue contained hearsay within hearsay -- or, "totem pole" hearsay. The first layer of hearsay was the defendant's out-of-court statement to Swain-Price. The second layer of hearsay was Nicole's out-of-court statement to the defendant. Totem pole hearsay is admissible only if each of the multiple hearsay statements falls within an exception to the hearsay rule. Commonwealth v. DePina, 476 Mass. 614, 623 (2017). See Mass. G. Evid. § 805 (2019) ("Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule . . .").

The defendant's out-of-court statement to Swain-Price was clearly admissible as a statement of a party opponent. See Commonwealth v. Cruzado, 480 Mass. 275, 278 (2018); Mass. G. Evid. § 801(d)(2)(a) (statement not hearsay where "statement is offered against an opposing party and . . . was made by the party"). Nicole's out-of-court statement to the defendant that she had seen him on television, however, was, if offered for the truth of the matter asserted, hearsay that does not fit within

any recognized exception.[18]  The Commonwealth argues that Nicole's statement and the defendant's response fit within the adoptive admission exception to the rule against hearsay.  See Mass. G. Evid. § 801(d)(2)(B).  We disagree.  An adoptive admission by silence can be imputed to a defendant only where it is "apparent that the [defendant] has heard and understood the statement, that he [or she] had an opportunity to respond, and that the context was one in which he [or she] would have been expected to respond to an accusation."  Commonwealth v. Olszewski, 416 Mass. 707, 719 (1993), cert. denied, 513 U.S. 835 (1994).  See Commonwealth v. Ferreira, 481 Mass. 641, 658 (2019).  The Commonwealth argues that the exception applies here because after the defendant's sister told him she had seen him on television, "he did not deny that he was involved with the murder."  It was not "apparent" from the challenged testimony, however, that the defendant responded to his sister's statement with silence.  Indeed, there was no testimony at all about what,

---

[18] Although the Commonwealth arguably had the opportunity to admit Nicole's statement as a prior out-of-court identification, see Mass. G. Evid. § 801(d)(1)(C) (2019), it chose not to call her as a witness in its case-in-chief.  Instead, the Commonwealth sought to circumvent the need for her direct testimony by admitting her prior identification through a third party without making her available for cross-examination. Commonwealth v. Barbosa, 463 Mass. 116, 130 (2012) ("A witness's pretrial identification is admissible for substantive purposes, even in the absence of an in-court identification, provided the identifying witness testifies at trial and is subject to cross-examination").

if any, response the defendant gave, as the trial judge ended the line of questioning as soon as Robinson testified regarding the statement. The Commonwealth has therefore failed to show that the defendant either understood the statement or had an opportunity to respond. Accordingly, this exchange does not fit within the adoptive admission exception to the rule against hearsay. See Olszewski, supra. See also DePina, 476 Mass. at 624 ("We have cautioned . . . against the use of adoptive admissions by silence . . ."). Its admission thus constituted an error. We conclude, however, that the error was harmless, as it did not influence the jury in any way. Cruz, 445 Mass. at 591.

Although Nicole's statement that she had seen the defendant on television was admitted in error, the testimony was cumulative of other evidence at trial and was therefore harmless. Cf. Commonwealth v. Evans, 439 Mass. 184, 191, cert. denied, 540 U.S. 923 and 540 U.S. 973 (2003) (no prejudice where hearsay involving prior identification evidence was cumulative of other properly admitted evidence). The evidence showed that both Robinson and the defendant's brother, Michael -- both of whom knew the defendant well -- also stated that they had seen him on television in the surveillance footage that was released to the public. Although Michael recanted this identification on direct examination at trial, the Commonwealth introduced

evidence that he had identified the defendant as the suspect in the surveillance video footage several times, including in a telephone call to police soon after the footage had been released, again several months later during an in-person interview with police, and again under oath before a grand jury. Moreover, the trial judge terminated the Commonwealth's line of questioning on Nicole's purported identification immediately after it was referenced, and the Commonwealth refrained from mentioning it at any other point during the trial. We therefore find "with fair assurance" that the jury in this case were "not substantially swayed by the error" (citation omitted). Cruz, 445 Mass. at 591. Cf. Commonwealth v. Spray, 467 Mass. 456, 471 (2014); Evans, supra.

5. Prosecutorial misconduct. Near the end of trial, the defense discussed with its expert witness a photograph of the defendant that was taken during his booking. While cross-examining the expert, the prosecutor characterized the photograph as a "booking photo." The defendant did not object to this statement at trial, but the trial judge nevertheless immediately instructed the prosecutor to avoid characterizing the photograph as a "booking photo" in the future. The defendant argues that this characterization amounted to prosecutorial misconduct and therefore constituted an error. Because the defense did not object to this statement when it was

made, we review any error to determine if it gave rise to a substantial likelihood of a miscarriage of justice. DePina, 476 Mass. at 624-625.

The defendant does not argue that this alleged error, standing alone, warrants reversal. He only argues that it should be considered in his final argument that reversal is required due to cumulative error. Even assuming, without deciding, that the prosecutor's characterization of the photograph constituted error, such an error certainly did not give rise to a substantial likelihood of a miscarriage of justice in this case. The photograph was labeled "booking photo" by the defense expert and was seen by the jury. Although the parties agreed to redact the reference to "booking" from the photograph before the case was submitted to the jury, the jury were well aware that the photograph purportedly had been taken at the defendant's booking. The prosecutor's characterization of the photograph therefore likely did not influence the jury's conclusion.

6. <u>Cumulative error and G. L. c. 278, § 33E</u>. Finally, the defendant argues that even if no one specific error argued <u>supra</u> requires that he be granted a new trial, the combined effect of the mistakes was so prejudicial as to create a substantial likelihood of a miscarriage of justice. We disagree. The cumulative error was no more prejudicial than the individual

errors, which, as explained <u>supra</u>, had minimal, if any, impact on the verdicts in this case.  See <u>Commonwealth</u> v. <u>Fuller</u>, 421 Mass. 400, 410-414 (1995).

Additionally, after a thorough review of the record, we find no reason to exercise our authority under G. L. c. 278, § 33E, to grant a new trial or to either reduce or set aside the verdict of murder in the first degree.

<u>Conclusion</u>.  For these reasons, we affirm the defendant's convictions and the denial of his motion for a new trial.

<u>So ordered</u>.