NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

23-P-21                                        Appeals Court

COMMONWEALTH  vs.  CLAUVENS JANVIER.

No. 23-P-21.

Middlesex.      September 15, 2023. – April 18, 2024.

Present:  Massing, Henry, & Grant, JJ.

Assault and Battery.  Cellular Telephone.  Global Positioning System Device.  Constitutional Law, Search and seizure, Probable cause.  Search and Seizure, Warrant, Affidavit, Probable cause.  Probable Cause.  Practice, Criminal, Motion to suppress, Warrant, Affidavit.

Indictments found and returned in the Superior Court Department on June 8, 2021.

A pretrial motion to suppress evidence was heard by James H. Budreau, J., and motions for reconsideration also were considered by him.

Applications for leave to prosecute interlocutory appeals were allowed by Dalila Argaez Wendlandt and Serge Georges, Jr., JJ., in the Supreme Judicial Court for the county of Suffolk, and the appeals were reported by them to the Appeals Court.

Timothy Ferriter, Assistant District Attorney, for the Commonwealth.
Catherine B. Sullivan Ledwidge for the defendant.

MASSING, J.  In this interlocutory appeal, both the Commonwealth and the defendant challenge an order of a Superior Court judge affirming in part and denying in part the defendant's motion to suppress geographic location data obtained with respect to two mobile telephone numbers and a cellular telephone pursuant to two search warrants.  At issue is whether the search warrant applications established probable cause to believe that the defendant owned or was using the phone numbers and phone during the eighteen-day period in which he was suspected of committing a series of crimes.  We conclude that they did and, accordingly, reverse the order allowing in part the motion to suppress.

Background.  Between November 10 and 27, 2020, a series of similar and seemingly random assaults and batteries took place in Waltham, mostly occurring in three geographic clusters within the city.  The defendant, Clauvens Janvier, was arrested in connection with the attacks on December 11, 2020.

On December 16, 2020, the Waltham police applied for the first of the two search warrants at issue in this appeal.  The application was supported by the affidavit of Detective Patrolman Thomas Bryant.  Bryant's affidavit set forth the following facts.

1.  The crimes.  The first attack occurred on the evening of November 10, 2020.  The victim was stepping out of his car

when a Black man, possibly with braided hair, wearing a black T-shirt and dark jeans, approached him.  Without speaking, the man pulled out what the victim thought was a long knife and swung it at him, cutting the victim's upper lip.  The passenger in the victim's car witnessed the attack and thought she recognized the perpetrator as the defendant, her former high school classmate.

The next night, in the parking garage of an office park near Brandeis University, a Black man wearing a red hooded sweatshirt and black sweatpants approached three men who were sitting in a parked car.  One of the occupants got out of the car; the assailant grabbed him by his hair, slammed his head into the side of the car, and punched him in the face.  The victim took a tire iron from the car to defend himself.  The assailant pulled a machete from his sweatpants, struck the victim with its blunt side, and then left the garage on foot.

Several more attacks followed between November 16 and 27. The victims were always male, and nearly each time the assailant struck without warning, usually from behind, and often with an unknown object as a weapon.  The assailant said little or nothing to the victims and fled without taking anything from them.  The victims described the perpetrator as a Black male with either dark or lighter skin, between five feet five inches and six feet tall, sometimes with braided hair, and typically

wearing a black or red hooded sweatshirt and black sweatpants or light-colored pants.

Based on the tentative identification by his high school classmate after the first incident, the defendant had become a suspect.  On November 22, the police contacted the defendant by telephone, as discussed more fully below, and the defendant agreed to go to the Waltham police station for an interview.  There, after receiving his Miranda warnings, he declined to speak with the police.

On December 7, the victim of the parking garage attack contacted the police because he had seen the man he believed was his attacker.  The victim reported that the man was wearing the same outfit as the night of the attack and was sitting in a parked car in the garage in the same spot the victim had observed the car on the night of the attack.  The police responded and approached the suspect's car.  The defendant was in the car, and the car, a 2004 Saab, was registered to him.[1]  Three days later the police prepared a photograph array from which the parking garage victim positively identified the defendant.  The next day, December 11, the police obtained a warrant for the defendant's arrest, located him in the Saab, and arrested him.  Based on the appearance of the Saab's interior,

---

[1] The Saab was the same car that the defendant had driven to the police station on November 22.

the police believed the defendant had been living in the car. At booking the defendant stated he was homeless; the police were never able to ascertain an address for the defendant. Authorized by two search warrants, not contested here, the police searched the defendant's Saab and found a "large knife/machete, a red hooded sweatshirt, [a] black hooded sweatshirt, light color pants, work style boots, [a] puffy black jack[et,] a black mask and a loaded gun [with] extra ammunition" and "a black iPhone [cell phone]."

2.  The phone numbers and phone.  On November 22, when Waltham Detective Sergeant McCarthy asked the defendant to come to the police station for an interview, McCarthy called the defendant at a 781 area code phone number.  The affidavit did not explain how McCarthy learned of the defendant's 781 number, but it did state that the police checked the number using a "free phone look up tool" called "Zetx," and that the number "came back to a wireless caller."  Records later obtained from MetroPCS pursuant to an administrative subpoena identified the defendant as the "subscriber" associated with the 781 number.

As noted, the police found an iPhone when they arrested the defendant and searched the Saab on December 11.  During booking, the defendant provided an 857 area code phone number.  Bryant confirmed that the iPhone was associated with the 857 number by sending a text message, which "appeared on the screen of the

phone." Another detective used the Zetx tool and learned that the 857 number was "listed to Metro PCS, which falls under T-Mobile[,] under the name" of the defendant.

3. <u>The search warrant applications</u>. Bryant applied for the first of the two challenged search warrants on December 16, 2020. This first application sought to command T-Mobile to provide historical cell site location information (CSLI), subscriber information, and global positioning system (GPS) data, if any, associated with the 781 and 857 numbers from 6 P.<u>M</u>. on November 10 through 3 <u>A</u>.<u>M</u>. on November 28, 2020, that is, beginning one and one-half hours before the first attack and ending five hours after the last attack. The warrant issued on the same day Bryant requested it, and T-Mobile produced the requested information except for GPS data.

On January 15, 2021, Bryant applied for the second of the challenged search warrants, this time focusing on information to be extracted from the cell phone seized from the defendant's vehicle at the time of his arrest, now more fully described as an "Apple iPhone SE 2 64G RED smartphone [in] a black case." The facts set forth in the accompanying affidavit largely duplicated those in the first affidavit, but added that location information obtained from T-Mobile pursuant to the first warrant had placed the defendant's phone in the vicinity of the attacks

on November 10, 11, 13, 20, and 22.[2]  The second affidavit also
stated that the phone number assigned to the defendant's iPhone
had changed from the 857 number to the 781 number.  Apparently
to explain the change, Bryant stated that "[c]ustomers of
TMobile who subscribe on a 'minutes-based' contract will have
their number changed if their contract lapses."  The application
sought a warrant to search the cell phone for, among other
things, a list of incoming and outgoing calls and text messages;
entries from "the electronic 'phone book' or list of contacts";
"[a]ccount names or IDs and passwords for applications, e-mail,
social media and related accounts"; and GPS or other location
data.[3]

    4.  Motion to suppress.  In July 2021 the defendant was
arraigned on twenty-five indictments arising from the string of
attacks and the discovery of the firearm in the Saab.  The
defendant filed a motion to suppress the information obtained

---

[2] The affidavit did not provide any location information to
corroborate the defendant's participation in the attacks on
November 16, 19, or after November 22.  The November 13 attack,
which rendered the victim unconscious, was reported at 6:22 P.M.
At 6:30 P.M., a call was made from within one-fourth of a mile
of a tower that was approximately two miles away from where the
attack occurred.

[3] The warrant application also sought the contents of any
text messages stored on the phone.  During proceedings in the
trial court on the motion to suppress, the Commonwealth conceded
a lack of probable cause to obtain the content of the
defendant's text messages.

from the two warrants, arguing that the warrants failed to establish probable cause that he was using the 781 number, the 857 number, or that he owned, possessed, or used the iPhone found in his car at any time during the period between November 10 and November 28, 2020.  The motion judge allowed the motion in part, suppressing any information obtained as the result of either search warrant for the period from November 10 to November 21, but denied the motion with respect to information obtained from November 22 through November 28.  The judge reasoned that the affidavits did not establish probable cause to believe that the defendant owned, possessed, or used a cell phone or either mobile phone number prior to November 22, the day the police contacted him using the 781 number, but that the affidavits did establish probable cause to believe that the defendant was using the phone and the phone numbers on and after that date.[4]

The Commonwealth applied to a single justice of the Supreme Judicial Court for interlocutory review of the order allowing in part the motion to suppress, as clarified by the order allowing

---

[4] The judge initially denied the motion as to location data for November 11, the date of the parking garage attack.  Acting on the defendant's motion for reconsideration, the judge agreed that the basis for allowing the motion to suppress for the period from November 10 to November 21 applied equally to information from November 11.  The order allowing reconsideration thus clarified that the suppression order applied to the CSLI from November 11.

the defendant's motion for reconsideration.  See note 4, supra.

The defendant, in turn, filed an application for interlocutory

review of the partial denial of his motion.  Both applications

were allowed, ordered consolidated, and referred to this court.

Discussion.  On appeal, the Commonwealth maintains that the

search warrant affidavits established probable cause to believe

that location data associated with the 781 number, the 857

number, and the defendant's cell phone would provide evidence of

his presence near the scenes of the crimes for the entire period

from November 10 to November 28.  The Commonwealth argues that

even though the affidavits did not establish that the defendant

was using the 781 number until the police contacted him at that

number on November 22, there was probable cause to believe he

was using the number during the twelve days before November 22.

Likewise, the Commonwealth argues that although the affidavits

included no information about the defendant's use of the 857

number or his possession of the iPhone until his arrest on

December 11, there was probable cause to believe that he had

been using the 857 number and the phone for at least thirty-one

days prior to his arrest.  The defendant does not take issue

with the judge's ruling that location information associated

with the 781 number would likely produce evidence of the crimes

from November 22 forward, but argues that the affidavits failed

to establish that the defendant's 857 number, in use on December

11, would provide relevant information for any time between November 10 and 28.

1. <u>Principles governing requests for CSLI</u>. "[T]he Commonwealth may obtain a search warrant for CSLI by establishing probable cause that the suspect committed a crime, that the suspect's location would be helpful in solving or proving that crime, and that the suspect possessed a cellular telephone at the relevant times." <u>Commonwealth</u> v. <u>Jordan</u>, 91 Mass. App. Ct. 743, 751-752 (2017). The affidavit in support of the warrant "must demonstrate probable cause to believe [1] that a particularly described offense has been, is being, or is about to be committed, and [2] that [the CSLI being sought] will produce evidence of such offense or will aid in the apprehension of a person who the applicant has probable cause to believe has committed, is committing, or is about to commit such offense" (quotations and citation omitted). <u>Commonwealth</u> v. <u>Perry</u>, 489 Mass. 436, 454 (2022).[5]

---

[5] The first warrant sought both CSLI and GPS data from T-Mobile. T-Mobile did not provide GPS data, presumably because GPS data is associated with mobile phones rather than mobile phone numbers. The second warrant authorized the police to search the defendant's phone for GPS data. For the purposes of this appeal, we may treat historical GPS data and CSLI the same. See <u>Commonwealth</u> v. <u>Augustine</u>, 467 Mass. 230, 254 (2014), <u>S.C.</u>, 470 Mass. 837 and 472 Mass. 448 (2015) ("GPS data and historical CSLI are linked at a fundamental level" because they both implicate "the same constitutionally protected interest -- a person's reasonable expectation of privacy -- in the same manner -- by tracking the person's movements").

Here, it is uncontested that the two search warrant affidavits established probable cause to believe that the defendant committed the string of attacks.  The only issue in this appeal is whether the affidavits demonstrated probable cause to believe that location data associated with the 781 number, the 857 number, and the defendant's cell phone would produce evidence that the defendant committed the crimes.  We address this question de novo.  See Commonwealth v. Molina, 476 Mass. 388, 394 (2017); Jordan, 91 Mass. App. Ct. at 748.  Our analysis is limited to the facts contained within the "four corners" of the affidavits and the reasonable inferences that may be drawn from those facts.  Commonwealth v. Henley, 488 Mass. 95, 114 (2021); Commonwealth v. O'Day, 440 Mass. 296, 297-298 (2003).

Because "cell phones have become 'an indispensable part of daily life and exist as almost permanent attachments to [their users'] bodies,'"[6] the magistrate or judge reviewing the warrant application may generally infer that the location data from a

---

[6] Seeking a warrant for location data from a cell phone is different from seeking to search its contents.  To search stored data, the warrant application may not rely merely on the "ubiquity" of cell phones, but must demonstrate "particularized information" that the phone contains evidence of the crime. Perry, 489 Mass. at 455, quoting Commonwealth v. Morin, 478 Mass. 415, 426 (2017).  See Commonwealth v. Hobbs, 482 Mass. 538, 547 n.11 (2019); Jordan, 91 Mass. App. Ct. at 752 n.8.

particular phone will yield the suspect's location at any given time.  Commonwealth v. Hobbs, 482 Mass. 538, 546 (2019), quoting Commonwealth v. Almonor, 482 Mass. 35, 45 (2019).  Therefore, "an affidavit establishing that a suspect committed a crime and that the suspect was known to own or use a particular cell phone" provides the requisite basis to believe that location data will provide evidence of the suspect's participation, or lack thereof, in the suspected criminal activity.  Hobbs, supra at 547.  See Perry, 489 Mass. at 455 (affidavits must provide "a substantial basis to conclude that the defendant used his or her cellular telephone during the relevant time frame, such that there is probable cause to believe the sought after CSLI will produce evidence of the crime").

The general legal principles concerning probable cause to obtain a search warrant are well established.  The affidavit must demonstrate "that items relevant to apprehension or conviction are reasonably likely to be found at the location" to be searched.  Commonwealth v. Murphy, 95 Mass. App. Ct. 504, 509 (2019).  "The probable cause standard does not require a showing that evidence more likely than not will be found."  Id.  "In dealing with probable cause . . . we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent [people], not legal technicians, act."  Jordan, 91 Mass. App.

Ct. at 748, quoting Commonwealth v. Hason, 387 Mass. 169, 174 (1982).

As to what establishes probable cause to believe that a suspect owned or was using a particular cell phone or mobile phone number at a particular time, however, our case law to date provides little guidance. In the leading case, Hobbs, the affidavit established the defendant's use of a particular phone number as follows. About two and one-half months after the murder under investigation, "the defendant's brother provided police with a telephone number for a cell phone he understood belonged to the defendant." Hobbs, 482 Mass. at 545. The brother "had not seen the defendant in several months" and did not know his whereabouts. Id. The defendant's former girlfriend corroborated the defendant's association with the cell phone number. See id. The decision, and presumably the affidavit, is silent as to when the former girlfriend had last seen or contacted the defendant. Thus, establishing that the defendant was using the phone number within months of the crime under investigation was sufficient to create probable cause to obtain CSLI in Hobbs. See id. at 548-549.

In Commonwealth v. Lavin, 101 Mass. App. Ct. 278, 280-282, 299 (2022), a warrant for CSLI was sought slightly more than one month after the crime. The decision states that the defendant's mother provided his cell phone number to the police. See id. at

300.  Although the decision does not state when this occurred, a reasonable inference would be that she provided the number around the time the police sought the warrant.

The Commonwealth, drawing on cases concerning the staleness of information contained in a search warrant affidavit, likens cell phones and mobile phone numbers to other forms of evidence that our cases have identified as durable.  With respect to the timeliness of an affidavit, "[i]nformation concerning an item that is perishable, readily disposable, or transferrable might not establish probable cause even a few days later." Commonwealth v. Guastucci, 486 Mass. 22, 28 (2020).  "On the other hand, an item that is durable, of enduring use to its holder, and not inherently incriminating might reasonably be found in the same location several weeks later."  Id.

Cell phones are durable goods, of enduring use, and not inherently incriminating.  Similarly, although there may be exceptions, it is reasonable to infer that most cell phone users retain their phone numbers for indefinite lengths of time to maintain social ties and business relationships.  For example, in United States v. Grupee, 682 F.3d 143, 145 (1st Cir.), cert. denied, 568 U.S. 1002 (2012), the affidavit established that the defendant's housemate had arranged to sell crack cocaine using a particular cell phone number six months prior to the application for a warrant to search the shared house for the phone.

Rejecting the defendant's staleness claim, the court held that it was reasonable to infer that the housemate "would still be using the same phone six months later . . . to maintain some degree of continuity or risk losing buyers," even though there was evidence he had used a second cell phone with a different number.  Id. at 146.[7]

2.  Application.  We apply these principles to determine whether the two search warrant applications established probable cause to believe that the defendant was using the phone numbers and phone in question during the period in which the crimes occurred.

a.  First search warrant.  The first warrant authorized T-Mobile to search its records and provide location data pertaining to the 781 number and the 857 number for the period from November 10 to 28.

---

[7] Other cases cited by the parties add little to our analysis.  For example, Perry, 489 Mass. at 438-440, 457-458, is inapplicable because the police were seeking "tower dumps" and were not targeting any particular suspect, phone, or phone number.  In Jordan, 91 Mass. App. Ct. at 747, before applying for the warrant, the police used an administrative subpoena to learn that the defendant had activated his cell phone number four years before the crime and had terminated service three weeks after the crime.  Although information of that nature in an affidavit would be desirable, nothing in Jordan suggests that it is necessary to establish probable cause.  It is perhaps relevant here that the defendant in Jordan used the same cell phone number for four years and terminated it around the time he had reason to believe that he was suspected of a crime.

i.  The 781 number.  The police used the 781 number to contact the defendant on November 22 and ask him to come to the police station for questioning.  Until he arrived at the station, the defendant had no reason to believe he was suspected of the crimes that had occurred during the previous twelve days.  As it can generally be inferred that people keep the same mobile phone number for extended periods of time to maintain contact with family, friends, and business associates, we readily infer that the defendant had been using the 781 number for at least twelve days before he appeared at the police station.

The fact that the defendant was apparently living out of his car and, inferentially, without substantial financial resources, does not cause us to question this result.  While it may be reasonable to infer that a person in the defendant's circumstances might not be able to afford to maintain a consistent mobile phone number, it is also reasonable to infer that because cell phones have become "indispensable to participation in modern society" (citation omitted), Carpenter v. United States, 138 S. Ct. 2206, 2220 (2018), a person in the defendant's situation would prioritize paying for mobile telephone service as a means of maintaining contact, communication, business ties, and even for entertainment.  Cf. Commonwealth v. Bruno-O'Leary, 94 Mass. App. Ct. 44, 50 & n.9 (2018) (fact that defendant had money to pay for heating and

cell phone did not necessarily imply that she could afford restitution payments).  The defendant had working mobile phone service using the 781 number on November 22.  There is a reasonable likelihood that he had service in the twelve preceding days, and that he did not coincidentally activate the 781 number on the very same day the police contacted him.

ii.  The 857 number.  When the police arrested the defendant on December 11, they learned he had another phone number, with an 857 area code, and they seized an iPhone from the defendant's vehicle that was associated with that number.[8] The defendant argues that because the affidavit provided no information establishing when he acquired the 857 number, it could not provide probable cause to believe that location data associated with that number would produce evidence of crimes that occurred between November 10 and 28.  In other words, the defendant's contention is that even though the 857 number was active on December 11, it is not reasonably likely that it had

---

[8] Bryant sent a text message to the 857 number, which caused Bryant's number to appear on the screen of the iPhone.  The defendant has not argued, here or in the trial court, that Bryant's verification of the phone number in this manner constituted a search.  See Commonwealth v. Alvarez, 480 Mass. 1017, 1018 (2018) (observing text message regarding drug transaction appear on outer screen of cell phone seized from defendant incident to valid arrest not a search where "[t]here was no evidence that the officer opened the cell phone, manipulated it to view the text message, or otherwise perused its contents").

been active for the full month before that.  Conversely, the Commonwealth necessarily contends that there was probable cause to believe that the 857 number had been in service for at least a month prior to December 11, such that data associated with it would yield evidence of the defendant's whereabouts between November 10 and 28.

As with the 781 number, it is reasonable to infer that the defendant did not just happen to activate the 857 number on the day he was arrested; therefore, the affidavit provided probable cause to believe that he had been using the 857 number at least for some time prior to December 11.  For the purposes of this case, we need not determine the outer limit of the likely duration of use of any given mobile phone number.  Considering the few cases on point, see Hobbs, 482 Mass. at 548-549; Lavin, 101 Mass. App. Ct. at 299-300, and the durability of mobile phone numbers in general, as discussed supra, we think that slightly more than one month is within that limit.

We recognize that this result suggests that the defendant may have had two different working mobile phone numbers or cell phones at the same time, which may appear inconsistent with his apparent poverty.  But we are reluctant to draw conclusions -- and we are certainly not permitted to take judicial notice, cf. Bruno-O'Leary, 94 Mass. App. Ct. at 50 n.9 -- about the mobile phone habits or proclivities of persons

of different levels of income.  The affidavit established that the defendant had two working mobile phone numbers during or just after the time of the crimes.  "[A] search warrant affidavit may establish probable cause that evidence could be found in more than one location."  Commonwealth v. Defrancesco, 99 Mass. App. Ct. 208, 213 (2021).  In dealing with probable cause, we are dealing with probabilities, not certainties, and search warrant affidavits are to be "read as a whole, not parsed, severed, and subjected to hypercritical analysis." Molina, 476 Mass. at 394, quoting Commonwealth v. Kaupp, 453 Mass. 102, 111 (2009).  A search warrant application need not exclude all other possibilities.  See Guastucci, 486 Mass. at 26 ("officers need not rule out a suspect's innocent explanation for suspicious facts to obtain a warrant" [quotations and citation omitted]); Commonwealth v. Hason, 387 Mass. at 175 ("Probable cause does not require a showing that the police resolved all their doubts").

"With due deference to the magistrate's determination of probable cause, and given the preference accorded to searches pursuant to warrants" (citations omitted), Jordan, 91 Mass. App. Ct. at 753, we conclude that the affidavit provided a substantial basis to believe that location information associated with the 857 number -- or the 781 number, or both -- would be reasonably likely to provide evidence of the

defendant's whereabouts during the relevant time period.  See

Perry, 489 Mass. at 455; Hobbs, 482 Mass. at 546.  The motion to

suppress the location information obtained pursuant to the first

warrant should have been denied.[9]

b.  Second search warrant.  The second warrant sought

location data and other information contained within the

---

[9] The defendant had not argued, here or in the trial court, that the police violated his Miranda rights when they obtained the 857 number from him at booking, and we disagree with our dissenting colleague that we could partially affirm the partial allowance of the motion to suppress (that is, as to the location data associated with the 857 number from November 10 through 21) on this ground.  While we are free to affirm on grounds different from those relied on by the motion judge, those grounds must be "supported by the record" and "the facts found by the judge."  Commonwealth v. Va Meng Joe, 425 Mass. 99, 102 (1997).  We cannot resolve the issue raised sua sponte by Justice Henry based on the information contained within the four corners of the affidavits.  Addressing the issue would require additional evidence and findings of fact concerning myriad issues, including when and if the police gave the defendant Miranda warnings during his arrest or booking, the defendant's criminal history and familiarity with Miranda warnings, the booking procedures of the Waltham police department, and the administrative necessity for police or probation departments to collect defendants' phone numbers at booking.  Because the defendant did not raise this issue in his motion to suppress, the Commonwealth was not on notice of the need to present evidence in this regard.  See Commonwealth v. Delossantos, 492 Mass. 242, 248-249 (2023).  As Justice Henry suggests that "in every case involving a crime where location is relevant," post at     , police may no longer ask for phone numbers at booking, it would be "particularly unwise" to reach this far-reaching issue here, "where the issue was not briefed on appeal and involves a novel question."  Ferreira v. Charland, 103 Mass. App. Ct. 194, 208 n.24 (2023).  Cf. Commonwealth v. White, 422 Mass. 487, 501 (1996) (declining to reach question whether police documentation of telephone number defendant called at booking fell within routine booking question exception to Miranda).

defendant's iPhone. The only new facts in the second affidavit were that (a) the location data obtained from the first warrant had confirmed the defendant's proximity to five of the attacks -- all before November 22; (b) the 857 number associated with the iPhone on December 11, 2020, was no longer in service as of January 15, 2021, apparently because the defendant had subscribed to that number on a "minutes-based" contract, which had expired; and (c) the phone, previously described as a black iPhone, was, more precisely, a red iPhone SE 2 64G in a black case.

The phone was seized from the defendant's car at the time of his arrest on December 11 and was associated with the 857 number at that time. As cell phones are durable items and not inherently incriminating, see Guastucci, 486 Mass. at 28, it is reasonably likely that the defendant possessed the same phone for a least a month before he was arrested. Moreover, the second affidavit established that the iPhone was associated with the 857 number on December 11 but had changed, or changed back, to the 781 number as of the date of the second affidavit about one month later. We have no difficulty concluding that location data associated with this cell phone would be reasonably likely to provide information about the defendant's whereabouts during the entire crime spree.

Conclusion.  The order allowing in part the defendant's motion to suppress, as clarified by the order allowing the defendant's motion for reconsideration, is reversed.  An order shall issue denying the motion to suppress (except as to the content of any text messages).[10]

So ordered.

_____

[10] See note 3, supra.

HENRY, J. (concurring in part and dissenting in part).  I disagree that the first search warrant application established probable cause to believe that the defendant "was known to own or use" the 857 phone number during the eighteen-day crime spree.  Commonwealth v. Hobbs, 482 Mass. 538, 547 (2023).  The affidavit submitted in support of the first application (affidavit) offers no facts, let alone a substantial basis, to conclude that he did.  Instead, the affidavit establishes that (1) the defendant was using the MetroPCS 857 number on December 11, which was fourteen days after the last attack, (2) he was using a different MetroPCS phone number (the 781 phone number) during the period of the attacks, (3) his home (i.e., his car) contained only one cell phone, and (4) the defendant was poor.  None of the twelve victims or any witness described the attacker as using or possessing a phone during any of the assaults and the attacks did not require a cell phone.  The majority infers that this unhoused defendant, who it acknowledges was "without substantial financial resources," ante at          , was simultaneously using both phone numbers and a second undiscovered phone -- though the affidavit does not claim that the defendant was "known to own or use" two phones or the 857 number during any part of the crime spree.  We are permitted to make reasonable inferences, but we cannot speculate.  I would

suppress all cell site location information (CSLI) associated with the 857 number.  To that extent, I dissent.

I write separately for two additional reasons.  First, the police obtained the defendant's 857 number during the booking process, which raises two concerns:  (a) the police immediately used the phone number to investigate, and (b) the affidavit recounted that the defendant had invoked his right to remain silent on November 22, 2020, and yet the four corners of the affidavit offer no statement that the defendant was re-Mirandized at his arrest or before booking.  It is a troubling notion that for any crime at a specific location, the police may obtain a cell phone number through "routine booking questions" and then use it to investigate.  Asking for a phone number is now far from routine; it is tantamount to asking the person to put themself at the scene of the crime.

The second reason I write separately is that, though I agree with the majority that the CSLI for the 781 phone number and the iPhone for the relevant period should not have been suppressed, given this record, I would expressly limit our holding by conditioning it on confirmation that the police had no information in their possession on the date of the first affidavit that the defendant was using a different phone (or no phone) prior to November 22, 2020.

1.  The CSLI data for the 857 phone number should be suppressed entirely.  As the majority explains, the question is whether the suspect was known to own or use a particular phone number (or phone) around the time of the crimes.  The majority concludes that "although there may be exceptions, it is reasonable to infer that most cell phone users retain their phone numbers for indefinite lengths of time to maintain social ties and business relationships."  Ante at      .  The majority also states that "[t]he fact that the defendant was apparently living out of his car and, inferentially, without substantial financial resources, does not cause [the majority] to question this result."  Ante at      .  It should.

To support probable cause to obtain CSLI, the affidavit in support of a search warrant must demonstrate "a substantial basis to believe that the sought-after CSLI 'will produce evidence of such offense or will aid in the apprehension of a person who the applicant has probable cause to believe has committed . . . such offense'" (emphasis added; citation omitted).  Hobbs, 482 Mass. at 545-546.  The nexus requirement of Hobbs "is satisfied as long as there is a substantial basis to conclude that the defendant used [their] cellular telephone during the relevant time frame, such that there is probable cause to believe the sought after CSLI will produce evidence of the crime."  Commonwealth v. Perry, 489 Mass. 436, 455 (2022).

The majority seems to believe it is reasonable to infer that the defendant was using both telephone numbers and two phones, the one that was found in the defendant's car (home), and some other phone that he discarded, even though he kept other items used during the attacks that identify him as the attacker (i.e., a large knife or machete, a red hooded sweatshirt, a black hooded sweatshirt, light color pants, work style boots, a black puffy jacket, a black mask, and a loaded gun with extra ammunition).

Here, the affidavit does not offer a substantial basis to conclude that the defendant was known to use the 857 number during the time period of the attacks (November 10 to November 27, 2020).  The only time the defendant was known to use the 857 number was on December 11, 2020, fourteen days after the last attack.  The affidavit offers no information to determine when the defendant switched from the 781 number to the 857 number even though the affidavit reports that the police have subscriber data for both phones and that the police can access the Zetx tool at will to verify the identity of the subscriber.[1]

---

[1] The affiant describes Zetx as a "free phone look up tool." Zetx is not available to the general public.  See LexisNexis Risk Solutions, Free Phone Lookup Tool, https://risk.lexisnexis.com/law-enforcement-and-public-safety/free-phone-look-up-tool [https://perma.cc/EWW5-8UKF]. The term "Zetx" has not been used in any case of the Supreme Judicial Court or this court and the affidavit does not explain its reliability.  It might behoove future affiants to provide

This paucity of facts is distinguishable from Hobbs, 482 Mass. at 545, where the police obtained the defendant's phone number from his brother and a former girlfriend offered corroboration, and Commonwealth v. Lavin, 101 Mass. App. Ct. 278, 300 (2022), where the police obtained the defendant's phone number from his mother. In those cases, the defendant was known to have one phone and one phone number -- as established by people with close personal ties to the defendant -- and therefore, the reasonable inference was that the defendant had been using that one number for some time, inferentially back to the time of the crime or crimes.

Here, the affidavit established the opposite. The affidavit attested that this unhoused defendant without substantial resources was using one phone number (the 781 number) on November 22, which was during the crime spree, and another phone number (the 857 number) on December 11, after the attacks had ended. The affidavit offers no connection from any source between the defendant and the 857 number during the attacks or even during the two weeks after the attacks had stopped.

I accept the majority's inference that if the defendant was using the 781 number on November 22, 2020, even considering his

that information. For purposes of this appeal, I accept that Zetx is reliable.

poverty, we can reasonably infer that he was using that number up to twelve days earlier.[2]  And even the defendant does not challenge the search warrant for the period November 22 to November 28.  However, nothing in the affidavit reasonably allows the inference that this defendant was simultaneously using a second phone number (the 857 number) and phone for the period from November 10 to November 28, 2020, when nobody associated him with that phone number or having two phones during that time frame.[3]  See Perry, 489 Mass. at 455 (to satisfy the nexus requirement established in Hobbs, there must be some particular evidence showing the defendant used or owned a cell phone during relevant time frame); Commonwealth v. Jordan, 91

---

[2] This certainly is a debatable point, and a reasonable magistrate or judge could reject an application for a search warrant where the supporting affidavit did not provide additional information to support an inference about how long a particular defendant or a person with the same prepaid cell phone plan might have had their phone number.

[3] The majority acknowledges that its result suggests that "the defendant may have had two different working mobile phone numbers or cell phones at the same time, which may appear inconsistent with his apparent poverty."  Ante at      . Still, the majority concludes that we cannot draw conclusions "about the mobile phone habits or proclivities of persons of different levels of income."  Ante at      .  Yet, the question of probable cause is a fact-based inquiry and I do not think we can ignore the defendant's poverty or draw counterfactual inferences.  Nor do I think we can ignore the fact that the affidavit established that the defendant had just one mobile phone -- not two, particularly where he kept the instrumentalities and accoutrements of the attacks that identify him.

Mass. App. Ct. 743, 751-752 (2017) (application for search warrant for CSLI must establish "that the suspect possessed a cellular telephone at the relevant times" [emphasis added]). It simply is not reasonable to infer that the defendant was using the 857 number over fourteen days earlier and, even more unreasonable to infer his use over thirty days earlier.

If the defendant was using the 781 and 857 phone numbers successively (and later reverting from the 857 number back to the 781 number as the second search warrant establishes), then it is not reasonable to infer that the defendant was using the 857 number during the time of the attacks.[4]  No case says that an affidavit in support of a search warrant can support two different possible inferences when we know only one is true.

---

[4] The police checked the 781 number in Zetx on November 22, 2020. The fact that the detective did not check the 781 number in Zetx again on December 11, 2020, also indicates that the police thought the defendant had changed from the 781 phone number to the 857 number. The majority acknowledges, as it should, that the defendant's number changed from 857 to 781 by January 15, 2021, apparently because the defendant was on a minutes-based plan. See ante at        . At the same time, the majority rejects the defendant's poverty and minutes-based plan as the explanation for why the defendant changed from the 781 number to the 857 number. See ante at        . Leaving aside this contradiction, this appeal is about CSLI -- it is not about subscriber data for these numbers, which the police already had, or consciousness of guilt. Of course, if the majority reads the affidavit as indicating the defendant was not a subscriber for the 857 number, that is another reason not to use inference to conclude that the defendant was using the 857 number a month before December 11 while simultaneously using the 781 number.

Yet this is exactly what the majority does when it concludes that the defendant could have both the 781 and 857 numbers at the same time when the reasonable inference is that he had just one number at a time. I cannot agree.

The majority's analysis of the 857 number also is troubling because it is based -- as it must be -- on the first search warrant application, but that affidavit did not disclose something the police knew to be true and that this court knows the police knew. It is only in the second affidavit that the police disclose that "Customers of TMobile who subscribe on a 'minutes based' contract will have their number change if their contract lapses." There is no likelihood that the police developed this knowledge between the date of the first affidavit (December 16, 2020) and the date of the second affidavit (January 15, 2021). The second affidavit offers this information as an explanation for why, after the defendant was arrested, the number for the one phone in the defendant's possession reverted from the 857 number to the 781 number.[5] This information about the defendant's phone number switching between

---

[5] I am in no way saying that the police withheld this information. Rather, I assume that at the time of the first affidavit, the affiant did not think he had a reason to disclose it. Indeed, there was no reason for the police to hide this information. Any cognizant resident of the Commonwealth is aware that cell phone plans can lapse for nonpayment and the customer can lose their number.

781 and 857, the defendant's poverty, and common sense allow the reasonable inference that the defendant was a prepaid cellular customer without enough money to pay his bill and keep his phone number. The majority's reading means that it is acting contrary to information it knows the police possessed.

The police have a duty to disclose information that they knew or should have known to the issuing magistrate or judge. Commonwealth v. Carrasco, 405 Mass. 316, 323 (1989), citing Maryland v. Garrison, 480 U.S. 79, 85 (1987) (officers have duty to disclose information that excludes one of two apartments on same floor). Courts should not ignore information known to the police to permit the conclusion that the four corners of the affidavit support probable cause. This is willful ignorance that could encourage the police to seek a search warrant early in their investigation to gain the benefit of inferences, even contradictory ones such as here (i.e., the defendant had two phones and two phone numbers; or, the defendant had one phone and two successive phone numbers, and the police may seek data for both, even though one of those phone numbers may have been given to a different customer).

The CSLI data associated with the 857 number from November 10 through November 28, 2020, should have been suppressed.

2. A cell phone number may no longer be routine booking information. I write separately to flag a second, concerning

issue, readily apparent within the four corners of the first affidavit.  That affidavit reports that the defendant invoked his right to remain silent on November 22, 2020.  The affidavit does not state that when the defendant was subsequently arrested or booked, he was given Miranda warnings.  This is important because the police obtained the 857 number from the defendant during booking but then immediately used that telephone number for an investigatory purpose.  The detective checked the 857 number in Zetx and determined it was "listed to Metro PCS, which falls under T-Mobile under the name 'Clauvens Janvier.'"  The affiant then sent a text message to the 857 number from his work cell phone and observed that his work cell number appeared on the screen of the defendant's iPhone.  Moreover, courts have treated routine booking questions differently from questioning a suspect.  But here, the police immediately used that 857 number obtained during booking to investigate.[6]

Even after the invocation of counsel, "[t]he police may ask routine booking questions, but not about the crime that is under investigation."  Commonwealth v. Chadwick, 40 Mass. App. Ct. 425, 427 (1996).  In the context of alleged violations of

---

[6] As the majority notes, the defendant has not argued that the affiant sending a text message to a phone to see if the text causes a notification to pop up on the lock screen constitutes manipulating the defendant's phone and therefore is a search. See ante at        .

Miranda v. Arizona, 384 U.S. 436 (1966), we have held that routine biographical questions such as those about name, age, or address, asked during a defendant's booking, are not interrogation within the meaning of Miranda. Commonwealth v. Kacavich, 28 Mass. App. Ct. 941, 941-942 (1990). However, "[a]lthough a booking officer proceeding down a litany of routine questions may have no investigatory purpose in asking the arrested person [certain questions], the content of that person's response may be incriminating" (emphasis in original). Commonwealth v. Woods, 419 Mass. 366, 373 (1995). The key inquiry is whether questions posed during booking "are designed to elicit incriminatory admissions" or have that potential. Id., citing Pennsylvania v. Muniz, 496 U.S. 582, 602 n.14 (1990). Here, asking the defendant for his phone number was tantamount to asking him to potentially place himself at the crime scenes. Indeed, while we call these devices "phones," they are personal tracking devices that are sometimes used to communicate with others by a messaging application, social media, or a phone call. Accordingly, in every case involving a crime where location is relevant, asking a suspect for their cell phone number is asking them to place themself at the scene of the crime. People being booked may not understand this, even with Miranda warnings. I need not and do not reach this issue,

which the magistrate should have noticed, but having seen the potential constitutional issue, I cannot ignore it.[7]

3. CSLI for the 781 number and the phone. As to the 781 number and the phone, though I agree with the result, we are basing our result on an inference and thereby implicitly assuming that the police had no contrary information. Given this record, I would make the implicit assumption an explicit condition of our holding.

I agree with the majority that our case law allows us to use inference and only inference to find probable cause to believe that the defendant "was known to own or use" the 781 phone number during the eighteen-day crime spree. However, I do not think we should be using mere inference to reach back from November 22 to November 10, 2020, for the 781 number where the police can -- and here did – obtain subscriber information with an administrative subpoena that does not require a search warrant. That information should have included length of service (including start date).[8] The affidavit establishes that

_____

[7] We can affirm (though not reverse) a suppression order on any ground supported by the record. See Commonwealth v. Rosado, 84 Mass. App. Ct. 208, 217 (2013).

[8] "The police may obtain subscriber information and toll records pursuant to a court order issued under 18 U.S.C. § 2703(d), but under art. 14 of the Massachusetts Declaration of Rights, the police may not use CSLI for more than six hours to track the location of a cellular telephone unless authorized by a search warrant based on probable cause." Commonwealth v.

on December 14, 2020, police sought and obtained one such administrative subpoena, identifying the defendant as the subscriber of record for the 781 number.  We should not rely on inference when the police have or could have had actual information.

Based on these concerns, I would condition our holding accordingly to state that the affidavit established probable cause to obtain the CSLI for the 781 phone number from November 10 to November 22, 2020, provided that the police had no information that contradicts the inference we draw here.  I conclude this based on information disclosed and not disclosed in the affidavit.  The police spoke to the defendant on the 781 number on November 22.  The affiant does not state how the police obtained the 781 number.  If the police had knowledge that the 781 number was not one that the defendant was known to use prior to November 22, 2020, they cannot withhold that information and benefit from an inference that is contrary to

---

Fredericq, 482 Mass. 70, 75-76 (2019).  See Carpenter v. United States, 138 S. Ct. 2206, 2221 (2018) (notwithstanding standard of "reasonable grounds" stated in 18 U.S.C. § 2703(d), "the [g]overnment must generally obtain a warrant supported by probable cause before acquiring [CSLI] records").  Cell phone service providers served with an administrative subpoena are required to disclose to the government certain subscriber information, including, information such as the subscriber's name, address, the "length of service (including start date) and types of service utilized[,]" and the "means and source of payment for such service (including any credit card or bank account number)."  18 U.S.C. § 2703(c)(2).

facts in their possession.  See Carrasco, 405 Mass. at 323-324. This is implicit in our ruling; I would make it explicit.

Conclusion.  Given the "significant constitutional questions" at issue, Hobbs, 482 Mass. at 549, I would suppress the CSLI for the 857 phone number.  As for the 781 number, I agree with the majority that we should reverse the order granting the defendant's motion to suppress the CSLI for the 781 number from November 10 at 6 P.M. to November 22, 2020, but I would condition that holding on confirmation that the police had no information in their possession on December 16, 2020, that the defendant was using a different phone (or no phone) prior to November 22, 2020.